

FILED
2019 Dec-09  PM 03:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SAMANTHA MALONE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CASE NO. 5:16-cv-00483-LCB** |
| | ) | |
| CITY OF DECATUR, ALABAMA, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
## OF DEFENDANT CITY OF DECATUR, ALABAMA

---

**George W. Royer, Jr.**
**David J. Canupp**
**J. Bradley Emmons**
**LANIER FORD SHAVER & PAYNE, P.C.**
**P. O. Box 2087**
**Huntsville, AL 35804**


***Attorneys for Defendant City of Decatur, Alabama***

TABLE OF CONTENTS

I.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Statement of Undisputed Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    General Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    Allegations as to Samantha Malone. . . . . . . . . . . . . . . . . . . . . . . . 7

      C.    Allegations as to Holly Kimmons. . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.    Allegations as to Mark Bledsoe. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      E.    Allegations as to Andy Fennell. . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      F.    Allegations as to Travis Mosley. . . . . . . . . . . . . . . . . . . . . . . . . . . 28

III.  Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      A.    Plaintiffs' § 1983 Claims Are Entirely Time-Barred by Alabama's
            Two-Year Statute of Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . 31

      B.    Because Plaintiffs Cannot Show the Existence of Any Wrongful
            Municipal Policy, the City is Entitled to Summary Judgment as to
            All § 1983 Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

      C.    The City is Entitled to Summary Judgment as to Plaintiffs' § 1983
            Claims Because Municipal Custom or Policy Was Not the
            Moving Force Behind Their Injuries. . . . . . . . . . . . . . . . . . . . . . . 41

      D.    Plaintiffs' Failure to File Notices of Claim with the City Requires
            Dismissal of Their State-Law Claim. . . . . . . . . . . . . . . . . . . . . . . 44

      E.    The City is Immune From Plaintiffs' Baseless State-Law Claim. . . 47

      F.    Plaintiff Fennell's Misrepresentations to the Bankruptcy Court
            Require That His Claims Be Dismissed. . . . . . . . . . . . . . . . . . . . . . 49

IV.   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

## I.   <u>Introduction</u>

Plaintiffs Second Amended Complaint ("SAC") boldly asserts that the City of Decatur "has maintained a modern-day debtors' prison through its unconstitutional policy, practice, or custom of using its police department to arrest and detain poor defendants who cannot pay fines and costs owed to the Municipal Court." (Doc. 41 ¶ 4). The SAC purports to support these broad and serious charges with specific facts purportedly drawn from the Municipal Court histories of five named plaintiffs. For instance, Plaintiff Holly Kimmons alleges that she was "jailed fifty-four (54) days for non-payment/violation in February of 2015." (<u>Id</u>. at ¶ 98). Similarly, Plaintiff Samantha Malone alleges that she was arrested on a failure to pay warrant and "spent one (1) month in jail." (<u>Id</u>. at ¶ 72).

Plaintiffs' weighty allegations have now been tested by cross-examination and through paper discovery, and they have crumbled. It turns out, for example, that Kimmons's February 2015 jailing had nothing whatsoever to do with non-payment of fines, fees, or costs, but instead related to her commission of new criminal offenses. Discovery has likewise shown that Malone's "one (1) month in jail" on a failure to pay charge was actually 17-18 days of incarceration on a theft charge, all served after she violated the terms of her probation by committing a new offense (harassment). The SAC also includes allegations intended to imply that the City, and not the Municipal Court, was somehow responsible for the judicial acts of the Court

1

involving the named plaintiffs — a strategy necessitated by strict principles of § 1983 liability that protect municipalities from been held responsible for the acts of third parties. (See, e.g., Doc. 41 ¶ 158) (alleging that the City "calculated Plaintiffs['] jail sentences"). Plaintiffs contended that the City somehow "caused" PPS to make inappropriate threats (see id. ¶¶ 58,  149). And Plaintiffs alleged that the City "used" its employees to harass, arrest, and incarcerate them when they could not pay fines and costs imposed by the Decatur Municipal Court. (See id. at 24-25).

These allegations have been disproven by Plaintiffs' own testimony as well. Plaintiffs' testimony, supplemented by arrest and Municipal Court records, actually establish that ***none*** of the five Plaintiffs were arrested for failure to pay fines and costs during the applicable limitations period, and ***none*** of the five Plaintiffs were threatened by City police officers or City prosecutors on the basis of the failure to pay court-imposed fines and costs. In other words, not only have Plaintiffs failed to show that a municipal policy caused any constitutional violations—they have failed to show any constitutional violations ***at all***. Instead, discovery has proven that the SAC repeatedly mixes up facts in order to match crimes and sentences that were not related, doctors timelines to make obviously time-barred claims appear timely, and alleges involvement of municipal actors who the Plaintiffs themselves now confess had nothing to do with their cases.

2

Even assuming their claims were otherwise valid, plaintiffs can point to no evidence whatsoever of a municipal policy or practice of threatening, arresting, jailing, or otherwise violating the rights of indigent persons. Case after case has established that Alabama cities and their officials cannot be held liable under § 1983 for the actions of municipal courts. See, e.g., <u>McCullough v. City of Montgomery, Ala.</u>, 2019 WL 2112963, at *5-7 (M.D. Ala. May 14, 2019) (citing <u>McCullough v. Finley</u>, 907 F.3d 1324, 1331-35 (11th Cir. 2018)). And in case after case, under exceedingly similar factual records, courts have found absolutely no evidence of any municipal custom or policy to violate the constitutional rights of probationers, much less evidence of any policy or custom that was the moving force behind such wrongs. See, e.g., <u>Woods v. Judicial Corr. Servs., Inc.</u>, No. 2:15-cv-493-RDP, 2019 WL 2372236, at *7-10 (N.D. Ala. June 5, 2019); <u>Ray v. Judicial Corrs. Servs., Inc.</u>, 2:12-cv-2819-RDP, 2017 WL 660842, at *12-16 (N.D. Ala. Feb. 17, 2017). For all of these reasons, the City has moved for summary judgment, and also filed a separate motion for judgment on the pleadings. This brief is submitted in support of the City's motion for summary judgment.

## II.   <u>Statement of Undisputed Facts</u>

A.   <u>General Allegations</u>

1.   "Under Alabama law, '[t]he judicial power of the state is vested exclusively in a unified judicial system' that includes 'such municipal courts as may

3

be provided by law.'" Ray v. Judicial Corrs. Servs., Inc., No. 2:12-cv-2819, 2017 WL 660842, at *11 (N.D. Ala. Feb. 17, 2017) (citing Ala. Const. of 1901, Art. VI, § 139(a), and Ala. Code § 12-1-2).

2.     The Decatur Municipal Court has jurisdiction over prosecutions of ordinance violations occurring within the City's police jurisdiction, as well as concurrent jurisdiction over all violation of state law within the City's police jurisdiction that may be prosecuted as ordinance violations. See Ala. Code § 12-14-1.

3.     The judge for the Decatur Municipal Court is Judge Billy E. Cook. (See Doc. 41 ¶ 28).

4.     Alabama law permits municipalities to "provide for probation services" for their respective municipal courts. Ala. Code § 12-14-2(a). Alabama law also permits municipalities "to enter into contracts in furtherance of their governmental functions." Ray, 2017 WL 660842, at *11 n.17 (citing Ala. Code § 11-40-1).

5.     In May 2004, the City and PPS entered into a Contract for the provision of probation services to the Decatur Municipal Court. (Alexander Aff. ¶ 2); (Exh. A to Alexander Aff.).

6.     The Contract that the City executed merely designated PPS as the private entity entitled to administer probation programs for offenders sentenced by and under the Decatur Municipal Court's jurisdiction. (See Exh. A to Alexander Aff., at 1).

7.     The Contract did not create, set forth, or otherwise specify any other ongoing duties or responsibilities of the City. (Exh. A to Alexander Aff.).

8.     Specifically, the Contract did not create, set forth, or otherwise specify any duties or responsibilities for City police officers. (Exh. A to Alexander Aff.).

9.     Although the Contract did not create, set forth, or otherwise specify any duties or responsibilities of the Decatur Municipal Court, it made clear that the Municipal Judge (and not the City) oversaw PPS's activities. (Exh. A to Alexander Aff.).

10.     The Specifications for Probation Services document ("Specifications") attached to the executed Contract contains the specific probation services that PPS was to provide in cases where the Decatur Municipal Court designated it to administer court-ordered probation. (See Exh. A to Alexander Aff., at 8-12).

11.     The Specifications make clear that PPS is subject to the control of the Municipal Court and do not purport in any way to delegate judicial functions to PPS. (See, e.g., Exh. A to Alexander Aff., at 8) ("Those offenders *the Court shall determine as indigent* shall be ordered as such and supervised at no cost."); (id. at 9) ("[U]pon payment of fines and cost *and only with the Court's approval*, the defendant's sentence is suspended and the case is closed."); (id.) (stating that intensive probation consists of three phases that "may be altered *as the Court requires*"); (id. at 11) (stating PPS will provide electronic monitoring " *as ordered*

5

*by the Court*"); (<u>id</u>. at 12) (requiring PPS to screen probationers' breath or urine "*as*

*ordered by the Court*").

12.    The Specifications also impose particular requirements for PPS to follow

with respect to indigent probationers:

> Those offenders the Court shall determine as indigent shall be
> ordered as such and supervised at no cost. Further, through pre-
> sentencing reports or interviews, PPS staff will identify those defendants
> who are lacking the resources to make payments and recommend to the
> Court the possibly [*sic*] converting portions of the fines or costs to
> community service hours as necessary. Moreover, all of the services
> provided are available to indigent offenders at no cost and PPS does not
> collect a probation supervision fee for any defendant who is determined
> to be indigent by the court. Additionally, PPS probation fees are
> assessed to non-indigents on a sliding scale according to the
> probationer's household income.

(Exh. A to Alexander Aff., at 8).

13.    On September 23, 2015, City Mayor Don Kyle sent a Notice to PPS that

the City was terminating its contract with PPS. (Exh. B to Alexander Aff.).

14.    Pursuant to said Notice, the City's Contract with PPS was terminated

effective the end of the day on December 31, 2015. (Alexander Aff. ¶ 6).

15.    Since the expiration of the Contract, the City has not appointed or

designated any entity to provide probation services for the Decatur Municipal Court,

and the City does not itself provide these services for the Court. (Alexander Aff. ¶ 7).

16.    By all indications, the Decatur Municipal Court no longer sentences

defendants to supervised probation. (Alexander Aff. ¶ 7).

B.   Allegations as to Samantha Malone

17.   **Malone was never arrested by City police officers for failure to pay court-imposed fines or costs at any point from March 24, 2014 through March 24, 2016.** (See Malone Rap Sheet, Exh. C to Alexander Aff., at 1) (showing no arrests between July 3, 2013, and December 3, 2016). In fact, Malone was not arrested by City police officers at all during that time period. (See, e.g., id.).

18.   The allegations of the SAC pertaining to Malone refer to a sentence of probation arising from charges of driving on a suspended license and violating child restraint laws. (See Doc. 41 ¶¶ 61-74). Malone alleges that she was pregnant while on probation with PPS on those charges. (Id. ¶ 65). She further alleges that a warrant was issued when she failed to pay fines on those charges, and that she was subsequently arrested and incarcerated for one month on that warrant. (Id. ¶¶ 71-72).

19.   The allegations of the SAC pertaining to Malone all concern several different Decatur Municipal Court cases that were adjudicated many years before March 24, 2014.

20.   In April 2005, Malone was cited for violating child restraint laws in Decatur Municipal Court case TR05-02321. (Exh. 6 to Malone Depo.). Malone appeared before Judge Cook and pleaded guilty in that case on June 13, 2005. (Id.); (Malone Depo. 73:2-5). Judge Cook sentenced Malone to probation, with total fines

of $130 paid out over six months, plus a PPS supervision fee of $35 per month and regular reporting to PPS. (See Exh. 6 to Malone Depo.); (Malone Depo. 72:10-13).

21.     Malone confirmed that the allegations in the SAC relating to these matters all refer to events that occurred in 2005. (Malone Depo. 55:5-8); (cf. Doc. 41 ¶¶ 61-66).

22.     On November 10, 2005, PPS submitted a warrant request to the Decatur Municipal Court, stating that Malone had violated the terms of her probation in TR05-02321. (Exh. 7 to Malone Depo.). Judge Cook issued a capias warrant on these matters on November 19, 2005. (Exh. 8 to Malone Depo.).

23.     City police arrested Malone on that warrant on May 22, 2006 (Exh. 8 to Malone Depo.); (Malone Depo. 52:5-8). She was booked, paid her bond, and released all on that same day. (Exhs. 9-10 to Malone Depo.); (Malone Depo. 52:20-54:6, 55:23-25). Malone was *not* incarcerated for one month in that case. (See Malone Depo. 56:1-8); (cf. Doc. 41 ¶ 72).

24.     In May 2008, Malone was cited for driving on a suspended license and a child restraint violation. (Exh. 2 to Malone Depo.). Malone again appeared before Judge Cook to plead guilty in those cases. (Malone Depo. 83:13-16). Judge Cook sentenced Malone to probation, with total fines and/or costs of $520 paid out over six months, plus a PPS supervision fee of $35 per month and regular reporting to PPS. (Exh. 3 to Malone Depo.).

8

25.     Malone paid off the court-imposed fines and costs relating to her May 2008 citations. (Exh. 4-5 to Malone Depo.); (Malone Depo. 48:1-22). Malone was *never* incarcerated as to those charges, let alone incarcerated for one month. (See Malone Depo. 48:23-49:9); (cf. Doc. 41 ¶ 72).

26.     At her deposition, Malone confirmed that the "one (1) month in jail" allegation in the SAC (Doc. 41 ¶ 72) actually pertains to about 17-18 days of incarceration, which she served after violating a sentence of probation in a theft case. (Malone Depo. 56:12-57:2, 59:6-61:8). In that theft case, Malone was arrested on August 20, 2012 on a probation violation warrant after being charged with a new offense of harassment. (Id.); (Malone Rap Sheet, at 1); (Exhs. 11-12 to Malone Depo.). The arrest and incarceration were completely unrelated to any failure to pay court costs or fines. (See Malone Depo. 56:20-57:2). In fact, Malone has *never* spent a month in jail due to failure to pay court costs or fines. (See id. 57:3-10).

27.     In short, Malone has not been arrested or spent *any* time in jail for failing to pay court-imposed fines and costs since 2006 *at the latest*. (See Malone Depo. 118:3-6). And for that matter, even *that* arrest was premised on Malone's other violations of the terms of her probation, such as her failure to attend court-ordered PPS appointments. (See id. 118:7-11).

9

28.     Since March 24, 2016, Malone has been arrested by City police officers on two occasions, on charges of third-degree burglary[1] and harassing communications. (Malone Rap Sheet, at 1); (Exhibit 3 - Malone 2016-2017 Arrest Records); (Exhibit 4 - Malone 2017 Warrant); (Exhibit 5 - Malone 2017 Booking Report). Both arrests occurred following the termination of the City's Contract with PPS, and neither arrest was for failure to pay court- or PPS-imposed fines, fees, or costs. (See id.).

29.     Malone denies that any City police officers have ever threatened her regarding the subject matter of this case, or in any other way. (Malone Depo. 57:21-58:13, 113:3-8, 118:19-21). Although she sometimes saw police officers at the PPS office, Malone and the officers never engaged, interacted, or communicated with each other. (See id.). Malone never saw anyone arrested at the PPS office. (Id. 112:13-23).

30.     Malone also denies that the City prosecutor ever threatened her regarding the subject matter of this case, or in any other way. (Malone Depo. 118:12-18).

31.     Malone never signed any Notice of Claim informing the City of Decatur that she intended to file a claim pertaining to the matters that were or could have been

---

[1]Malone was adjudicated guilty of this charge in Morgan County Circuit Court on November 9, 2017. See State v. Malone, CC-2017-000160.00, Doc. 28 (Morgan Cnty. Cir. Ct. Nov. 28, 2017); see also id., Doc. 35 (Morgan Cnty. Cir. Ct. Mar. 19, 2018) (felony sentencing order); id., Doc. 64 (Morgan Cnty. Cir. Ct. Mar. 1, 2019) (certificate of Alabama Court of Criminal Appeals affirming judgment).

10

addressed in this lawsuit, and she never submitted any such Notice of Claim to the City's clerk. (Malone Depo. 58:14-21); (Alexander Aff. ¶ 20).

C.    Allegations as to Holly Kimmons

32.    **Kimmons was never arrested by City police officers for failure to pay court-imposed fines or costs at any point from March 24, 2014 through March 24, 2016.** (See, e.g., Exh. 2 to Kimmons Depo., at 1-2). Instead, *all* of Kimmons's arrests in that period pertained to charges of third-degree theft, theft by deception, disorderly conduct, harassment, and resisting arrest. (See, e.g., id.).

33.    On January 7, 2014, Kimmons appeared before Judge Cook and pleaded guilty to two charges of theft by deception in cases 2013CRM3016 and 2013CRM3017, arising out of a January 2013 incident at a Belk department store. (See Exhs 8-9 to Kimmons Depo.); (Kimmons Depo. 54:23-24:5, 57:15-58:9).[2]

34.    As part of her sentences, Kimmons was placed on twelve months' probation in both cases by Judge Cook. (See Exhs. 8-9 to Kimmons Depo.). A further condition of both sentences was that Kimmons was prohibited from violating any federal, state, or local laws while on probation. (See id.).

35.    However, just ten days later, on January 17, 2014, Kimmons was arrested again. (See Exh. 2 to Kimmons Depo., at 1) (showing arrest on that date). Kimmons

---

[2]A third related charge of theft by deception was dismissed as part of Kimmons's plea agreement. (See Exh. 8 to Kimmons Depo.); (Kimmons Depo. 62:8-13).

Case 5:16-cv-00483-LCB   Document 109   Filed 12/09/19   Page 15 of 56

was charged with third-degree theft (2014CRM185) and resisting arrest (2014CRM186) stemming from an incident at a Target store. (See Exh. 3 to Kimmons Depo., at 1-4); (see also Kimmons Depo. 66:23-67:4, 69:22-70:5).

36. Kimmons's conduct on January 17, 2014 violated the probation condition in the Belk cases prohibiting the violation of state or local laws. (See Exhs. 8-9 to Kimmons Depo.). As such, her arrest on that date led to the revocation of probation in those cases. (See Exh. 4 to Kimmons Depo., at 5-6). Judge Cook issued probation violation warrants in those two cases on January 22, 2014. (Id.). The warrants were executed on January 24, 2014. (See id.); (see also Exh. 2 to Kimmons Depo., at 1) (showing arrest on that date).

37. On June 10, 2014, Kimmons appeared before Judge Cook and pleaded guilty in the Target cases. (Exhs. 10-11 to Kimmons Depo.). As part of her sentences, Kimmons was placed on twenty-four months' probation in both cases by Judge Cook. (See id.). A further condition of both sentences was that Kimmons was prohibited from violating any federal, state, or local laws while on probation. (See id.).

38. On September 16, 2014, Kimmons was arrested outside of a private residence. (See Exh. 5 to Kimmons Depo., at 1-4); (see also Exh. 2 to Kimmons Depo., at 1-2) (showing arrest on that date); (Kimmons Depo. 55:20-25). She was charged with disorderly conduct (2014CRM2802) and resisting arrest (2014CRM2803). (See id.). The records concerning that arrest do not indicate that

Kimmons was arrested or jailed for failure to pay court costs or fines. (See Exh. 5 to Kimmons Depo., at 1-4). Kimmons subsequently pleaded guilty to the charges in these two cases. (See Exh. 12-13 to Kimmons Depo.).

39.   Kimmons's conduct on September 16, 2014 violated the probation condition prohibiting the violation of state or local laws in the two Belk cases (2013CRM3016 and 2013CRM3017) and the two Target cases (2014CRM185 and 2014CRM186). (See Exhs. 8-11 to Kimmons Depo.). As such, her arrest on that date led to the revocation of probation in *all four cases*, and Judge Cook issued probation violation warrants in all four cases on September 19, 2014. (See Exh. 6 to Kimmons Depo., at 23-26). Additionally, a fifth warrant for Kimmons's arrest was issued on that same date, relating to a new harassment charge. (See id. at 22); (Kimmons Depo. 56:1-9). None of these warrants were premised on a failure to pay court costs or fines. (See Exh. 6 to Kimmons Depo., at 22-26).

40.   On September 20, 2014, Kimmons was arrested on all five warrants that had been issued the previous day. (Exh. 6 to Kimmons Depo., at 1-6, 22-26) (showing execution of warrants on September 20, 2014); (see also Exh. 2 to Kimmons Depo., at 2) (showing arrest on that date). Kimmons was incarcerated until October 23, 2014 following that arrest. (Exh. 6 to Kimmons Depo., at 14-18) (showing court release on that date). The records concerning that arrest do not indicate that Kimmons was arrested or jailed for failure to pay court costs or fines. (Id. at 1-6, 22-26).

13

41.     On November 7, 2014, a warrant was issued for Kimmons's arrest, charging her with third-degree theft arising out of an October 2014 incident at a Walmart store. (Exh. 7 to Kimmons Depo., at 16); (see also Kimmons Depo. 56:15-20, 75:22-76:14, 96:7-9) (discussing Walmart theft charge in 2015CRM521). This charge again led to the revocation of probation in the two Belk cases and the two Target cases, and warrants were issued by Judge Cook in all four cases on December 3, 2014. (Exh. 7 to Kimmons Depo., at 17-20). None of these warrants are premised on a failure to pay court costs or fines. (See id. at 16-20).

42.     Kimmons was arrested on all five warrants on February 24, 2015, after she turned herself in at the City's Police Department. (Exh. 7 to Kimmons Depo., at 1-5, 16-20). The records concerning that arrest do not indicate that Kimmons was arrested or jailed for failure to pay court costs or fines. (See id.).

43.     Kimmons was released from the Decatur City Jail 56 days later, on April 21, 2015. (See id. at 10) (showing release of possessions to Kimmons on that date); (see also Exh. 14 to Kimmons Depo.) (showing sentence in Walmart case on that date, with a sentence of 50 days with credit for time-served).

44.     Although Kimmons originally alleged in the SAC that she "was jailed fifty-four (54) days for non-payment/violation in February of 2015" (Doc. 41 ¶ 98), she does not dispute that this allegation pertains to her arrest in February 24, 2015, for reasons *completely unrelated* to failure to pay fines and costs. (Kimmons Depo.

14

51:22-53:13) (responding "[p]robably so" when asked whether that SAC allegation referred to her February 2015 arrest on theft and probation-revocation warrants).

45.    Kimmons has not been arrested by City police officers since February 24, 2015. (Exh. 2 to Kimmons Depo., at 2); (see also Kimmons Depo. 53:14-54:10).

46.    The foregoing records establish that *every arrest* of Kimmons by City police officers between March 24, 2014, and March 24, 2016 was premised on charges unrelated to any failure to pay court costs and fines. Absolutely no mention of any alleged failure to pay court costs and fines is made in any of the records pertaining to those arrests. (See, e.g., Exh. 2 to Kimmons Depo., at 1-2).

47.    In fact, on each probation-violation warrant issued for Kimmons's arrest during that period, the box reading "[t]he defendant has failed to pay fines, court costs and/or restitution" is *not* checked. (See Exh. 6 to Kimmons Depo., at 23-26); (Exh. 7 to Kimmons Depo., at 17-20). Instead, every warrant indicates that Kimmons "has been charged with new offense(s)" before listing the charge(s) and court case(s) at issue. (See id.).

48.    Kimmons denies that any City police officers ever threatened her regarding the subject matter of this case, or in any other way. (Kimmons Depo. 110:17-111:16). Although she sometimes saw police officers at the PPS office,

Kimmons and the officers never engaged, interacted, or communicated with each other. (See id.).[3]

49.    Kimmons denies that City prosecutors ever threatened her regarding the subject matter of this case or in any other way. (Kimmons Depo. 112:5-9, 112:18-21)

50.    Kimmons never signed any Notice of Claim informing the City of Decatur that she intended to file a claim pertaining to the matters that were or could have been addressed in this lawsuit, and she never submitted any such Notice of Claim to the City's clerk. (Kimmons Depo. 112:22-25); (Alexander Aff. ¶ 20).

D.    Allegations as to Mark Bledsoe

51.    **Bledsoe was never arrested by City police officers for failure to pay court-imposed fines or costs at any point from March 24, 2014 through March 24, 2016.** (See, e.g., Bledsoe Rap Sheet, Exh. E to Alexander Aff., at 2). Although Bledsoe was arrested in that period, that arrest pertained to charges of possession of paraphernalia and public intoxication. (See id.).

52.    On January 7, 2014, Bledsoe appeared before Judge Cook and pleaded guilty to a charge of possession of paraphernalia in case 2013CRM2661. (Exh. 2 to Bledsoe Depo., at 6); (see also Bledsoe Depo. 54:6-56:9) (not disputing guilty plea for that charge on that date). As part of his sentence in that case, Bledsoe was placed

---

[3] Although Kimmons did see people arrested at PPS offices on about three occasions, she does not know why they were arrested. (See Kimmons Depo. 153:13-154:18).

on twelve months' probation by Judge Cook. (Exh. 2 to Bledsoe Depo., at 6). A further condition of that sentence was that Bledsoe was prohibited from violating any federal, state, or local laws while on probation. (See id.).

53.     As a further condition of his probation, Bledsoe was also directed to either pay a court-imposed fine totaling $726 "or serve community service." (Exh. 2 to Bledsoe Depo., at 6).

54.     In lieu of paying the fine in his possession of paraphernalia case, Bledsoe completed community service. (See Exh. 2 to Bledsoe Depo., at 32-33) (showing community service covering $726); (Exh. 6 to Bledsoe Depo., at 1-2); (Bledsoe Depo. 92:12-21). Bledsoe's fines and costs in that case were marked as paid in full no later than March 21, 2014. (See id.).[4]

55.     On November 9, 2014, Bledsoe was arrested on a single charge of public intoxication. (Exh. 4 to Bledsoe Depo., at 3-4, 20-21). The arrest records do not indicate that Bledsoe was arrested or jailed for failure to pay court costs or fines. (Id.).

56.     While Bledsoe was jailed following that arrest, Judge Cook issued a probation violation citation in 2013CRM2661, the possession of paraphernalia case. (Exh. 2 to Bledsoe Depo., at 18). The box reading, "The defendant failed to pay fines

---

[4]Bledsoe testified that he also paid some fees to PPS while on probation, but he was not confident that he did so in his paraphernalia case, and he could not rule out the possibility that he had paid these fees in an earlier case. (See Bledsoe Depo. 90:10-91:2). In any event, there is no dispute that the balance owed in that case was $0 before Bledsoe's next arrest.

/ court costs / restitution" is *not* checked. (See id.). Instead, the citation states that Bledsoe "has been charged with new offense(s), to wit," the public intoxication charge. (Id.). A probation violation charge was then added to Bledsoe's arrest report in the public intoxication case. (Exh. 4 to Bledsoe Depo., at 1-2) (noting "11/10/14 new charge added" and referencing probation violation charge).

57.     Bledsoe was incarcerated for five days before appearing in front of Judge Cook on the public intoxication charge. (Exh. 5 to Bledsoe Depo., at 1). Bledsoe pleaded guilty to the charge at that time, and Judge Cook sentenced him to five days in jail, with time-served credit for all five days. (Id.); (Bledsoe Depo. 69:19-72:23). At the same time, Judge Cook dismissed the probation violation charge stemming from the paraphernalia case, finding "no violation." (Exh. 4 to Bledsoe Depo., at 11). Bledsoe was then released from the Decatur City Jail. (Exh. 4 to Bledsoe Depo., at 10) (noting court release on November 14, 2014); (Bledsoe Depo. 104:9-20).

58.     In other words, contrary to the allegations of the SAC (cf. Doc. 41 ¶ 87), Bledsoe was *not* "jailed for two (2) weeks for failure to pay." Instead, he was incarcerated for five days for public intoxication. (See Exh. 5 to Bledsoe Depo., at 1); (Exh. 4 to Bledsoe Depo., at 10); (see also Bledsoe Depo. 104:21-105:2) ("I think it was just for five days.").

59.     Contrary to the allegations of the SAC (cf. Doc. 41 ¶ 84), Bledsoe testified that it was *Judge Cook*, and not the City, that rejected a doctor's excuse as

a "cartoon piece of paper." (E.g., Bledsoe 50:17-22, 82:5-19, 118:22-119:6, 150:14-151:2). Bledsoe testified that Judge Cook made this statement when he appeared before Judge Cook after his public intoxication arrest. (See id. 82:5-19). Bledsoe testified that no one else made this statement to him. (See id. 151:14-151:2).

60.    Bledsoe has not been arrested by City police officers since his November 2014 public intoxication arrest. (See Bledsoe Rap Sheet, at 2); (see also Bledsoe Depo. 106:3-6).

61.    Bledsoe recalls City police officers being present when he would visit the PPS office while on probation. (Bledsoe Depo. 95:6-8). However, he only remembers talking to one officer, who simply asked why it was taking so long for Bledsoe to finish his probation; Bledsoe replied, "You tell me," and the officer laughed. (Id. 95:9-96:3). At some other time, the same police officer asked Bledsoe to "rat on" another person, and Bledsoe declined. (Id. 99:12-20).

62.    Beyond those two interactions, Bledsoe does not remember any other discussions with City police officers, at the PPS office or anywhere else. (See Bledsoe Depo. 96:4-97:5, 99:21-100:3). In particular, he does not recall any City officers ever talking to him about fines or costs that were owed in Decatur Municipal Court cases. (See id. 97:10-18).

63.     Contrary to the allegations of the SAC (cf. Doc. 41 ¶ 76), Bledsoe does not recall talking to the City prosecutor in his Decatur Municipal Court proceedings. (Bledsoe Depo. 98:9-16).

64.     Bledsoe never signed any Notice of Claim informing the City of Decatur that he intended to file a claim pertaining to the matters that were or could have been addressed in this lawsuit, and he never submitted any such Notice of Claim to the City's clerk. (Bledsoe Depo. 98:17-99:2); (Alexander Aff. ¶ 20).

E.     Allegations as to Andy Fennell

65.     **Fennell was never arrested by City police officers for failure to pay court-imposed fines or costs at any point from March 24, 2014 through March 24, 2016.** (See, e.g., Def. Exh. 3 to Fennell Depo., at 3). Although Fennell was arrested once in that period, that arrest pertained to a drug possession charge and a charge of driving with a revoked license, as detailed below. (See, e.g., id.).

66.     On September 23, 2014, Fennell was arrested by City police officers on charges of possession of marijuana, driving with a revoked license, and prohibited stopping, standing, and parking. (Def. Exh. 2 to Fennell Depo., at 1-3, 11-12); (Def. Exh. 3 to Fennell Depo., at 3) (showing arrest on that date). Fennell agrees that this September 23, 2014 arrest is the one described in the SAC. (Fennell Depo. 66:8-20).[5]

---

[5](See also, e.g., id. 53:11-59:4) (disputing the charges arising from that arrest, but not disputing that the events described in the arrest report correspond with the arrest described in the

67.     On November 12, 2014, Fennell appeared before Judge Cook on these charges. (See Def. Exh. 4 to Fennell Depo., at 1); (Def. Exh. 5 to Fennell Depo., at 1); (Def. Exh. 6 to Fennell Depo., at 4). At that time, Fennell pleaded guilty to the charges of possession (2014CRM2892) and driving while revoked (2014TRT12532), and pursuant to that guilty plea, his prohibited stopping charge (2014TRT12533) was dismissed. (See id.).

68.     In the possession case, Judge Cook sentenced Fennell to twelve months' probation and imposed a total fine of $726, among other conditions. (See Def. Exh. 6 to Fennell Depo., at 4). In the driving while revoked case, Judge Cook sentenced Fennell to twelve months' probation and imposed a total fine of $262. (See Def. Exh. 4 to Fennell Depo., at 1).

69.     **There is no evidence that Fennell was *ever* arrested or jailed for failure to pay in either case.** City arrest records show no City arrests of Fennell after September 23, 2014. (See Def. Exh. 3 to Fennell Depo., at 3). Decatur City Jail booking records do not show Fennell ever being booked there after the September 23, 2014 arrest. (See Exhibit 12 - Fennell Work With Booking Report). Fennell himself repeatedly confirmed that after his September 2014 arrest, he was never again arrested by City of Decatur police. (See, e.g., Fennell Depo. 53:11-54:1, 75:24-76:7,

SAC); (id. 63:1-20) (agreeing, *contra* the SAC, that the arrest described in that pleading did not involve a charge of speeding).

107:11-16). And the court files for the two aforementioned cases have no record of any arrest after September 2014. (See Def. Exhs. 4 & 6 to Fennell Depo.).

70.    In fact, as detailed below, PPS records show that Fennell's payments in those cases were more or less timely—and, importantly, that all payments to PPS or to the Municipal Court itself were properly recorded towards the fines and costs imposed on Fennell by Judge Cook. (See Def. Exh. 7 to Fennell Depo., at 1-2).

71.    Fennell was charged $35 per month in PPS service fees (for a total of $420 over twelve months) while on probation in these two case, and his payments towards this amount were properly recorded each month. (See Def. Exh. 7 to Fennell Depo., at 1-2) (blue highlighting denoting "fees" payments in 2014CRM2892 totaling $420); (see also, e.g., Fennell Depo. 87:1-90:8) (agreeing that the records show this amount was paid off). Additionally, Fennell paid off the $262 fine in his DWR case within about three months of his sentencing in that case, and these payments were also properly recorded. (See Def. Exh. 7 to Fennell Depo., at 1) (orange highlighting marking "fine" payments in 2014TRT12532 totaling $262); (see also, e.g., Fennell Depo. 84:4-86:17) (agreeing that the records show this amount was paid off).

72.    Thereafter, Fennell made payments toward the $726 fine in his possession case. (See Def. Exh. 8 to Fennell Depo.) (municipal court payment records

pertaining to 2014CRM2892).[6] PPS records show that Fennell made $530 in payments on that case before the City's contract with PPS was terminated at the end of 2015. (See Def. Exh. 7 to Fennell Depo., at 1-2); (see also Fennell Depo. 93:12-18) (noting that Fennell made some payments after the Municipal Court "took back over PPS"). Fennell agreed that each individual payment recorded by PPS, totaling $530, appeared to have been subsequently recorded in Decatur Municipal Court records, albeit with a slight time delay. (See Def. Exh. 7-8 to Fennell Depo.); (see also Fennell Depo. 91:15-96:19) (noting correspondence between payments in PPS records and payments in Municipal Court records). Fennell further agreed that Municipal Court records showed the remaining $196 balance was paid off through four payment directly to the Municipal Court in calendar year 2016. (See Exh. 8 to Fennell Depo., at 1); (see also Fennell Depo. 97:15-98:23) (acknowledging his recorded payments in 2016 covered the $196 balance).

73.   The foregoing records show two things: (1) that Fennell was never arrested or jailed by the City for failing to pay fines or court costs in the case at any

---

[6]Due to computer formatting, some of the payments recorded in the Municipal Court files appear on multiple pages. Each distinct payment can be identified by the corresponding date, time, and receipt number. In addition to the $726 total fine, Fennell did not dispute that the Municipal Court records showed an additional $35 payment corresponding to a bond fee he had to pay directly to the Municipal Court in September 2014, immediately after his arrest but before his sentence. (See Def. Exh. 8 to Fennell Depo., at 5); (Fennell Depo. 75:19-23, 77:5-12) (see also Def. Exh. 6 to Fennell Depo., at 19) (showing collection of $35 "Bail Bond 'Filing Fee'" on or about September 23, 2014).

time from March 24, 2014 to the present (see, e.g., Def. Exh. 3 to Fennell Depo., at 3); and (2) the Decatur Municipal Court properly applied every payment that Fennell made to PPS, and every payment he made directly to the Municipal Court after the PPS contract ended, towards his fine in the possession case (see, e.g., Def. Exhs. 7-8 to Fennell Depo.).[7]

74.    Fennell repeatedly testified that after his September 2014 arrest, he was never again arrested by City of Decatur police for any offense. (See, e.g., Fennell Depo. 53:11-54:1, 75:24-76:7, 107:11-16).

75.    Later in his deposition, Fennell testified that he was arrested for driving with a revoked license in Morgan County. (See, e.g., Fennell Depo. 148:12-19); (see also Pl.'s Exh. 1 to Fennell Depo., at 5). He testified that this arrest also concerned "restitution" due in one or more cases arising out of the City of Decatur. (See Fennell Depo. 152:16-24). Fennell was not sure of the date of the arrest, but knew it occurred after his September 2014 arrest. (See Fennell Depo. 150:12-22, 152:8-18). Fennell testified at first that he believed the Morgan County arrest involved City police

---

[7]In both the SAC and his deposition, Fennell expressed some confusion regarding certain information on his receipts recording payments to PPS. (See Doc. 41 ¶¶ 111-13); (see also Def. Exh. 10 to Fennell Depo.) (receipts for payments to PPS in August, September, and October 2015). However, as Fennell came to understand at his deposition, the receipts themselves properly reflect the *total* amount of fines and fees "ordered," the amount that had been "paid" as of each month, and the correct "balance" still remaining after that month's payment was applied. (See Def. Exh. 10 to Fennell Depo.); (Fennell Depo. 174:16-24) (acknowledging that payments were properly "reflected in the balance" on receipts); (see also Fennell Depo. 160:24-174:15) (going over balances and payments).

24

officers, but he also expressed an understanding that "[t]he City and the County is the same though." (See id. 151:1-20).

76.     However, Fennell admitted that the arrest in question was not handled at the Decatur Municipal Court by Judge Cook; in fact, Fennell has not been to the Decatur Municipal Court for some time and does not even know if it still exists. (See, e.g., Fennell Depo. 154:24-155:4). Instead, this arrest was handled at the *Morgan County Courthouse*, and required payment of restitution to *Morgan County*, not the City of Decatur. (See id. 149:16-22, 153:17-25); (Pl.'s Exh. 1 to Fennell Depo., at 5).

77.     Publicly available court records confirm that the post-2014 arrest described by Fennell was a *Morgan County* arrest on four *Morgan County* cases. These cases originally arose out of arrests that were originally adjudicated in the Decatur Municipal Court before being appealed to the Morgan County Circuit Court in *2002*. (See Exhibit 13 - Certified Documents from Morgan Cnty. Cir. Ct. No. 2002-CC-000005, at 1-5); (Exhibit 14 - Certified Documents from Morgan Cnty. Cir. Co. No. 2002-CC-000013, at 1-4); (Exhibit 15 - Certified Documents from Morgan Cnty. Cir. Ct. No. 2002-CC-000018, at 1-5); (Exhibit 16 - Certified Documents from Morgan Cnty. Cir. Ct. No. 2002-CC-000020, at 1-5). In August 2016, Fennell entered into a Restitution Recovery Docket Agreement in those cases, agreeing to pay certain amounts imposed by the Morgan County Circuit Court and to appear for a hearing in December 2016. (See, e.g., Exh. 13 at 6-7).When he did not appear for that hearing,

the Morgan County Circuit Court issued warrants for his arrest in those four cases. (See Exh. 13 at 8-9); (Exh. 14 at 7-8); (Exh. 15 at 8-9); (Exh. 16 at 8-9). The warrants were executed by the Morgan County Sheriff's Office on March 30, 2017, and bear the signature of the arresting deputy and the Morgan County Sheriff. (See id.). Subsequent proceedings in those cases were handled entirely by the Morgan County Circuit Court. (See, e.g., Exh. 13 at 10-15).

78.     In short, the undisputed evidence shows that the only *City* arrest since March 24, 2014 resulting in a sentence placing Fennell on probation was the September 23, 2014 arrest.

79.     Fennell was never arrested at the PPS office. (See Fennell Depo. 134:16-19). Although he did see some people arrested at the PPS office on occasion, he had no firsthand knowledge of the reasons for their arrests. (See id. 134:20-136:14).

80.     Fennell himself did not ever talk to any City police officers when he visited the PPS office. (Fennell Depo. 100:23-101:13). Fennell never spoke to City police officers anywhere else about the fines and costs imposed as a result of the arrest and probation described in the SAC. (See id. 101:14-102:18, 103:25-104:5). Although Fennell testified that he was "threatened" if he did not pay his court-imposed fines and costs to PPS (see id. at 134:7-15), he clarified that these alleged threats came only from his PPS-employed probation officer. (See id. 136:15-137:23)

81.    Fennell never spoke to any City prosecutor before pleading guilty in the possession or DWR cases. (Fennell Depo. 103:18-24).

82.    Fennell never signed any Notice of Claim informing the City of Decatur that he intended to file a claim pertaining to the matters that were or could have been addressed in this lawsuit, and he never submitted any such Notice of Claim to the City's clerk. (Fennell Depo. 104:6-105:15); (Alexander Aff. ¶ 20).

83.    On March 12, 2018, Fennell filed a petition for Chapter 13 bankruptcy in In re Fennell, No. 18-bk-80741 (Bankr. N.D. Ala.). (Exhibit 17 - Fennell Chapter 13 Case Docket); (Exhibit 18 - Fennell Chapter 13 Petition). The Petition is signed under oath. (See Exh. 18 at 6). The Petition does not identify this lawsuit as an asset. (See id.).

84.    On March 26, 2018, Fennell property schedules in support of his sworn Petition. (Exhibit 19 - Fennell Chapter 13 Summary of Assets). Although item 33 in Schedule A/B asked whether the debtor has any claims against third parties or any pending lawsuits, Fennell did not identify this lawsuit as an asset in response. (See id., at 6).

85.    Even after telling his attorney that he was pursuing this lawsuit, Fennell signed his Petition and schedules even though they lacked any mention of his claims in this action.

86.     Fennell did not subsequently identify this lawsuit as an asset in his Chapter 13 Plan or any amendments thereto. See <u>In re Fennell</u>, No. 18-bk-80741, Chapter 13 Plan (Doc. 17) (Bankr. N.D. Ala. Mar. 29, 2018); <u>id</u>., Amended Chapter 13 Plan (Doc. 21) (Bankr. N.D. Ala. May 2, 2018).

87.     Fennell's Chapter 13 Plan was confirmed on June 21, 2018. See <u>In re Fennell</u>, No. 18-bk-80741, Order (Doc. 35) (Bankr. N.D. Ala. June 21, 2018).

88.     Fennell has not filed any documents to amend his disclosures in order to inform the bankruptcy court of the existence of this lawsuit. (See Exh. 17).

F.     <u>Allegations as to Travis Mosley</u>

89.     **Mosley was never arrested by City police officers for failure to pay court-imposed fines or costs at any point from March 24, 2014 through March 24, 2016.** (See Mosley Rap Sheet, Exh. G to Alexander Aff., at 1-2). In fact, Mosley has not been arrested by City police officers since *2011*. (See, e.g., <u>id</u>.).[8]

90.     Mosley was incarcerated in the Morgan County Detention Facility for failure to pay child support from April 7, 2011 through July 27, 2011. (Exh. 7 to Mosley Depo.); (see also Mosley Depo. 108:18-22) (acknowledging incarceration in Morgan County during that period for failure to pay child support).

_____

[8]The SAC also includes allegations expressly concerning cases in which Mosley was on probation, under PPS supervision, "[f]rom 2006 until 2010" (Doc. 41 ¶ 130), well outside of the applicable limitations period.

91.    On April 29, 2011, while Mosley was incarcerated at the Morgan County Detention Facility, Judge Cook signed warrants for Mosley's arrest arising out of four Decatur Municipal Court cases. (Exh. 3 to Mosley Depo., at 5-8); (see also Mosley Dep. 109:13-110:6) (agreeing that the allegations of the SAC relating to incarceration for failure to pay child support refer to this detention); (cf. Doc. 41 ¶¶ 138-40).

92.    Mosley was arrested by a City officer on those four court-issued warrants on July 27, 2011, after being released from the Morgan County Detention Facility. (See Exh. 3 to Mosley Depo., at 1-2, 5-8); (see also Mosley Depo. 111:9-18). He returned to court on those cases in October 2011. (See, e.g., Mosley Depo. 114:18-115:14).

93.    Mosley testified that he has never been arrested by City police officers since his July 27, 2011 arrest on the four aforementioned warrants, and that he has never been jailed in the Decatur City Jail since that time. (See Mosley Depo. 110:13-111:8, 112:6-25).

94.    Other than receiving traffic tickets in 2017 (well after the PPS contract had ended), Mosley has never encountered City police officers at all after his July 27, 2011 arrest, and he has never spoken to any City police officers about court costs or fines or fees. (See Mosley Depo. 112:10-25, 115:15-116:17).

95.     Other than when handling the aforementioned 2017 traffic tickets, Mosley has never returned to Decatur Municipal Court since his October 2011 hearing. (Mosley Depo. 115:15-21).

96.     Although Mosley sometimes saw people arrested at the PPS office while he was on probation in pre-2014 cases, he has no firsthand knowledge about the reasons for those arrests. (See Mosley Depo. 149:19-150:6)

97.     After July 2011, Mosley never spoke with any City prosecutor about court-imposed fines or costs. (Mosley Depo. 113:21-25, 116:18-117:3).

98.     After July 2011, Mosley never spoke to any City employee about court-imposed fines or costs. (Mosley Depo. 114:6-8). Mosley never saw any City employees at the PPS office. (Mosley Depo. 119:5-23)

99.     Mosley never signed any Notice of Claim informing the City of Decatur that he intended to file a claim pertaining to the matters that were or could have been addressed in this lawsuit, and he never submitted any such Notice of Claim to the City's clerk. (Mosley Depo. 119:24-120:2); (Alexander Aff. ¶ 20).

### III.   <u>Argument</u>

Plaintiffs bring four counts against the City in their Second Amended Complaint. Count I alleges violations of the Due Process and Equal Protection clauses due to the City allegedly threatening, harassing, intimidating, and jailing them for being unable to pay fines and costs imposed in Decatur Municipal Court

proceedings. (See Doc. 41 ¶¶ 141-47). In Count II, Plaintiffs allege violations of the Fourth Amendment for arrests premised on an inability to pay court fines and costs. (See id. ¶¶ 148-55). Count III asserts a Sixth Amendment claim arising from alleged wrongful calculations of sentences, failures to conduct indigency hearings, failures to appoint or inform Plaintiffs of their right to counsel, and jailing Plaintiffs for failure to pay fines and costs in the absence of these safeguards. (See id. ¶¶ 156-62). Finally, in Count IV, Plaintiffs bring a single state-law claim for false imprisonment based on arrests pursuant to warrants premised on information received from PPS. (See id. ¶¶ 163-68).[9]

A.   Plaintiffs' § 1983 Claims Are Entirely Time-Barred by Alabama's Two-Year Statute of Limitations

The Court has previously held that Plaintiffs' constitutional claims may only give rise to municipal liability through a showing that the City's police officers and prosecutor acted wrongfully pursuant to municipal policy. (See Doc. 75 at 15-16). However, the undisputed evidence shows that as to the named Plaintiffs, neither the

_____

[9]Plaintiffs specifically seek damages under each of these Counts. (Doc. 41 ¶¶ 147, 155, 162, 168). Although Plaintiffs offhandedly request "an Order enjoining the defendants from continued unconstitutional conduct" (id. ¶ 12), the Court has already determined that this throwaway comment does not constitute an adequate demand for injunctive. (See Doc. 75 at 17). In any event, for the reasons previously stated in the City's brief in support of its motion to dismiss (see Doc. 28 at 37-40), which the City hereby adopts and incorporates by reference, any request for injunctive relief is now moot. See also Ray v. Judicial Corr. Servs., Inc., 270 F. Supp. 3d 1262, 1288 (N.D. Ala. Sept. 12, 2017) (holding claims for injunctive relief to be moot where private probation company ceases operations).

City's police officers nor the City prosecutor acted wrongfully at any point within the applicable statute of limitations. Moreover, there is no evidence of any City policy or custom concerning such wrongful acts. As such, Plaintiffs' § 1983 claims are due to be dismissed without further discussion.

It is by now well established that claims pursuant to 42 U.S.C. § 1983 are governed by the relevant state's general personal injury statute of limitations. See, e.g., Owens v. Okure, 488 U.S. 235, 249-50 (1989). In Alabama, the appropriate statute of limitations is two years. See, e.g., Jones v. Preiut & Mauldin, 876 F.2d 1480, 1483 (11th Cir. 1989) (citing Ala. Code § 6-2-38(*l*)). Therefore, because Plaintiffs filed the SAC on March 24, 2016 (see Doc. 1), any claims that accrued prior to **March 24, 2014** are time-barred.[10] Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action." Corn v. City of Lauderdale Lakes, 904 F.2d 585, 588 (11th Cir. 1990).

Here, even assuming that Plaintiffs' claims were otherwise cognizable, those claims plainly accrued well before March 24, 2014. To the extent that Plaintiffs premise these claims on being arrested and jailed by City police officers for failure to pay fees and fines relating to PPS (see, e.g., Doc. 41 ¶ 144-45, 149-52), the

---

[10]Because Plaintiff Mosley was only added to this action via the filing of the First Amended Complaint on June 28, 2016 (see Doc. 22), the statute of limitations actually applies to bar any of his claims that accrued prior to **June 28, 2014**. Since Mosley's claims are time-barred under either limitations period, this distinction need not be examined further.

undisputed evidence shows that *none* of the five named Plaintiffs were arrested or jailed by City police officers on this basis after March 24, 2014. Malone and Mosley were not arrested or incarcerated by City police officers *at all* between that date and the termination of the City's Contract with PPS. (See, e.g., Malone Rap Sheet, at 1); (Mosley Rap Sheet, at 1-2). Kimmons was arrested three times by City officers in that period, but her arrests were on charges of disorderly conduct and resisting arrest, a warrant-based charge for third-degree theft, and warrants arising from the fact that these aforementioned offenses (and *not* a failure to pay fines and costs) constituted probation violations. (See, e.g., Exh. 5 to Kimmons Depo., at 1-4); (See Exh. 6 to Kimmons Depo., at 1-6, 22-26); (Exh. 7 to Kimmons Depo., at 1-5, 16-20). Bledsoe was arrested once by City officers in that period, but his arrest was on a charge of public intoxication and a probation violation citation arising from that offense, *not* from any failure to pay fines or costs. (See, e.g., Exh. 2 to Bledsoe Depo., at 18); (Exh. 4 to Bledsoe Depo., at 1-2). Similarly, Fennell was arrested a single time by City officers in the limitations period, but only on charges of possession of marijuana and driving while revoked, *not* failure to pay. (See, e.g., Def. Exh. 2 to Fennell Depo., at 1-3, 11-12). None of these arrests support any § 1983 claim at issue in this action.

Nor may Plaintiffs premise their claims on any other interaction with City employees. Every Plaintiff acknowledges that City police officers never even *spoke* to them about fines and costs in Decatur Municipal Court cases, let alone threatened

or harassed them over those amounts, during the limitations period. (See, e.g., Malone Depo. 57:21-58:13, 113:3-8, 118:19-21); (Kimmons Depo. 110:17-111:16); (Bledsoe Depo. 95:9-97:5, 99:21-100:3); (Fennell Depo. 100:23-102:18, 103:25-104:5); (Mosley Depo. 112:10-25, 115:15-116:17). Similarly, every Plaintiff has testified that he or she either did not speak to the City prosecutor about fines or costs during the limitations period or does not remember doing so. (See, e.g., Malone Depo. 118:12-18); (Kimmons Depo. 112:5-9, 112:18-21); (Bledsoe Depo. 98:9-16); (Fennell Depo. 103:18-24); (Mosley Depo. 113:21-25, 116:18-117:3).

There is simply no evidence in the record showing that Plaintiffs were ever threatened, harassed, intimidated, incarcerated, or otherwise treated wrongfully by City officials during the limitations period for failure to pay fines and costs relating to Decatur Municipal Court cases. In the absence of such a showing, Plaintiffs' claims are due to be dismissed as time-barred.

> B.   Because Plaintiffs Cannot Show the Existence of Any Wrongful Municipal Policy, the City is Entitled to Summary Judgment as to All § 1983 Claims

Under 42 U.S.C. § 1983, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978). "[M]unicipal liability is limited to action for which *the municipality is actually responsible*." Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)

(emphasis supplied). Plaintiffs must therefore establish that *the City*, and not some other party, is actually responsible for the conduct and injuries alleged. Instead of doing so, however, the undisputed evidence in this case shows that the City committed absolutely no unconstitutional acts—and more crucially, that any purportedly wrongful conduct stemmed *entirely* from the acts of others for whom the City cannot be held liable. Consequently, as the Eleventh Circuit and other courts have recently made clear, no municipal policy is at issue, and the City is entitled to summary judgment as to all of Plaintiffs' claims under § 1983.

The City adopts in full, and hereby incorporates by reference, the arguments raised in the brief in support of its motion for judgment on the pleadings filed concurrently with the instant motion. As the authorities cited therein make clear, the incontestable rule in the Eleventh Circuit is that an Alabama municipality can *never* be held liable for the issuance of warrants, indigency hearings (or lack thereof), provision of counsel (or lack thereof), sentences, calculations of court fines and costs, probation procedures, the designation of a private company to handle a probation sentence, imprisonment for non-payment of court-imposed fines, and other judicial acts performed by Judge Cook and/or the Decatur Municipal Court, or acts arising therefrom. See, e.g., McCullough v. Finley [McCullough I], 907 F.3d 1324, 1331-35 (11th Cir. 2018); McCullough v. City of Montgomery, Ala. [McCullough II], 2019 WL 2112963, at *5-7 (M.D. Ala. May 14, 2019) (citing, e.g., McCullough I, 907 F.3d

35

at 1331-32); Ray v. Judicial Corrs. Servs., Inc., No. 2:12-cv-2819-RDP, 2017 WL 660842, at *12-13 (N.D. Ala. Feb. 17, 2017); see also, e.g., Woods v. Judicial Corr. Servs., Inc., No. 2:15-cv-493-RDP, 2019 WL 2372236, at *7-10 (N.D. Ala. June 5, 2019); Hunter v. Etowah Cnty. Ct. Referral Program, 309 F. Supp. 3d 1154, 1185-87 (N.D. Ala. 2018).

Moreover, because this case is at the summary-judgment stage, the reasoning of McCullough, Ray, and their progeny applies even more clearly to the factual record here. For instance, as to Plaintiffs' Sixth Amendment claim in Count III, Plaintiffs sometimes appears to suggest (despite the *factual* allegations of the SAC) that it was somehow the City, and not the Decatur Municipal Court, that calculated their sentences with an eye on fines and costs (see Doc. 41 ¶ 158) or that sentenced them without first "informing them of their right to counsel, appointing counsel on their behalf, or obtaining a knowing, intelligent and voluntary waiver of counsel" (id. ¶¶ 159-60). But there is no evidence showing that any City officials "presided over any proceedings in which they could have informed a defendant of his rights, appointed counsel, or considered alternative sentences. And certainly, [city officials] did not sentence jailees . . . ." See McCullough I, 907 F.3d at 1335 (precluding liability for city officials based on judicial acts performed by judicial actors).

To the contrary, the factual record here establishes that the proceedings at issue here were *Municipal Court* proceedings. As the law of this circuit establishes,

36

because Alabama municipal courts are part of the state's unified judicial system, municipal liability cannot be predicated on the judicial acts of municipal court judges. See, e.g., McCullough II, 2019 WL 2112963, at *5 (citing, e.g., Ala. Const. of 1901, Art. VI, § 139(a)); Ray, 2017 WL 660842, at *13-14 (observing that Alabama law "d[oes] not grant the City any control over the Municipal Court's judicial functions" and that any argument conflating the two entities "cuts no ice"). It is therefore undeniable, "as a matter of law and logic," that the acts complained of in Count III are *judicial acts* for which the City cannot be held liable. See Ray, 2017 WL 660842, at *13-14. As a result, the City is entitled to summary judgment as to Count III without any further discussion. And to the extent that Plaintiffs' other claims are premised on the issuance of warrants, sentences, or orders of incarceration (see, e.g., Doc. 41 ¶¶ 142-43, 150), those claims are likewise due to be dismissed.[11]

These same authorities also foreclose Plaintiffs claims in Counts I and II, which are wholly premised on the alleged acts of the City's police officers and/or other City

---

[11]Plaintiffs have at times suggested that even though the Municipal Court did not sign the Contract with PPS, the City may bear liability for the court's judicial acts because the Contract somehow "bound [the] municipal court to PPS's illegal practices." (See Doc. 18 at 11). The Court appears to have already rejected this contention. (See Doc. 75 at 15-16) (limiting Plaintiffs' municipal claims *only* to alleged *municipal* acts). But even if that were not the case, the Eleventh Circuit's decision in McCullough leaves no room for Plaintiffs' argument. See McCullough I, 907 F.3d at 1335 (rejecting claims against municipal officials regarding "misconduct in the municipal court"); see also Ray, 2017 WL 660842, at *12 (finding under similar facts that "no Alabama law or authority supporting the proposition that the JCS-City Contract bound the Municipal Court to appoint JCS as the probation service of all defendants or to include JCS's probation fees in every order").

employees. (See Doc. 41 ¶¶ 141-55); (see also Doc. 75 at 15-16) (construing SAC). In these claims, Plaintiffs contend that City officials threatened them, harassed and intimidated them, issued warrants in their name, arrested them, and jailed them, all for failure to pay fines and costs. (See, e.g., Doc. 41 ¶¶ 142-45, 149-52).

However, Plaintiffs can make no showing whatsoever of any City policy of threatening, harassing, intimidating, arresting, or incarcerating persons such as themselves on the basis of a failure to pay Municipal Court and/or PPS fines and fees. The record is bereft of evidence that *any* Plaintiff was arrested or incarcerated on that basis by any City official at any relevant time—and Malone and Mosley were not arrest or incarceration by the City *at all* during the limitations period.[12] There is also zero evidence of any harassment or threats from City officials, as *not a single Plaintiff* testified that he or she was ever threatened, harassed, or even spoken to by any City officers or employees regarding fines or fees pertaining to PPS or Municipal Court cases. These facts alone bar recovery on Plaintiffs' claims. See, e.g., <u>Rooney v. Watson</u>, 101 F.3d 1378, 1381 (11th Cir. 1996) (citing <u>Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986)) (recognizing that where no law enforcement officer has caused a

---

[12]Nor may any Plaintiff premise a constitutional claim in this case on his or her arrests and incarceration *prior to* a sentence of probation being imposed by Judge Cook. See, e.g., <u>Carden v. Town of Harpersville</u>, No. 2:15-cv-1381-RDP, 2017 WL 4180858, at *17 (N.D. Ala. Sept. 21, 2017) (dismissing Fourth Amendment claim where the plaintiff "was arrested and incarcerated *before* the Municipal Court ordered her to complete JCS-supervised probation").

constitutional violation, the employing government entity cannot be subject to § 1983 liability).[13]

But even if Plaintiffs had made *any* showing to the contrary, the City could not be held liable for such conduct because "Plaintiffs have not identified [and cannot identify] the final decisionmaker for the City who [would have been] responsible for issuing a policy or custom directing officers to arrest probationers based on invalid [failure to pay] charges," or for issuing a policy or custom to otherwise interact wrongfully with probationers on the basis of such charges. See Ray, 2017 WL 660842, at *15. Again, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." See Monell, 436 U.S. at 691. Put another way, " the City cannot be held liable under Section 1983 on a *respondeat superior* basis for the conduct of employees who lacked final decisionmaking authority." See Ray, 2017 WL 660842, at *15 (citing Monell, 436 U.S. at 690)).

In this case, there is no evidence of any municipal policy or custom of using City police officers, City prosecutors, or other City employees to threaten, harass,

---

[13]Even if the record were otherwise, Plaintiffs' claims in Count II concerning arrest and incarceration pursuant to warrants issued by the Decatur Municipal Court still fail. As noted in the brief in support of the City's motion for judgment on the pleadings, such claims under the Fourth Amendment are properly construed as malicious prosecution claims; however, Plaintiffs have presented no evidence that any proceedings related to their arrest for failure to pay fines and costs ever terminated in their favor. See, e.g., Ray v. Judicial Corr. Servs., Inc., 270 F. Supp. 3d 1262, 1307 (N.D. Ala. 2017); see also Carter v. Gore, 557 F. App'x 904, 906 (11th Cir. 2014).

intimidate, arrest, or incarcerate probationers who failed to pay fines and costs arising out of Municipal Court proceedings or PPS-administered probation. Nor, for that matter, is there any evidence of any City *policymaker* behind such a policy. Plaintiffs have submitted no documentation showing the existence of such a municipal policy of this nature, and Plaintiffs' testimony revealed no policy of this nature. And even if Plaintiffs were somehow attempting to predicate their claims on the City's Contract with PPS, "Plaintiffs have not demonstrated that the [PPS]-City Contract itself contained any policy or custom regarding the duties of the City's police" or other City employees. See <u>Ray</u>, 2017 WL 660842, at *15. Instead, the Contract imposes *no requirements whatsoever* on City police officers or other municipal officials with respect to probationers under PPS's supervision. (Exh. A to Alexander Aff.). Because Plaintiffs cannot show the existence of any relevant City policymaker—or indeed, any relevant City policy—their § 1983 claims are not viable.

In summation, there is no evidence that any City official committed any constitutional wrong. Even if the record were otherwise, there is no evidence of any municipal *policy* that can render the City liable for such conduct. For that reason, the City is entitled to judgment as a matter of law as to all of Plaintiffs' § 1983 claims.

C.      The City is Entitled to Summary Judgment as to Plaintiffs' § 1983
        Claims Because Municipal Custom or Policy Was Not the
        Moving Force Behind Their Injuries

As argued above, Plaintiffs cannot establish that (1) any City police officer or employee committed any constitutional wrong, (2) as a result of City policy, (3) within the relevant limitations period. Faced with these hurdles, Plaintiffs appear to suggest at times that the City may nonetheless be subject to § 1983 liability because City policy somehow caused *other actors*, not employed by the City, to violate their constitutional rights. (See Doc. 41 ¶ 145) (suggesting that the City somehow "*caused* Plaintiffs to be threatened") (emphasis supplied). However, Plaintiffs can point to no evidence that any municipal policy was the *direct, proximate cause* of any constitutional wrong accruing within the limitations period. This fact, too, requires summary judgment in the City's favor.

"[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." E.g., Hill v. Cundiff, 797 F.3d 948, 977 (11th Cir. 2015) (quoting Bd. of Cnty. Commr's v. Brown, 520 U.S. 397, 404 (1997)). Instead, a plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a ***direct causal link*** between the municipal action and the deprivation of federal rights." See id. (quoting Brown, 520 U.S. at 404) (emphasis supplied). Put another way, a plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury

41

alleged." See <u>Brown</u>, 520 U.S. at 404. For a plaintiff to satisfy this "**stringent**" standard, "[t]he evidence must show the deprivation of the constitutional right is a '**plainly obvious**' consequence of the municipal action." See <u>Hill</u>, 797 F.3d at 977 (citing <u>Brown</u>, 520 U.S. at 411) (emphasis supplied); see also <u>Ray</u>, 2017 WL 660842, at *15 (noting that this "**rigorous** standard of causation" is necessary "to avoid imposing *respondeat superior* liability on a municipality") (emphasis supplied).

Plaintiffs' § 1983 claims cannot survive this "rigorous" standard. <u>McCullough</u> leaves no doubt that municipal actors cannot be the moving force behind "ordinary judicial functions" such as "probation procedure, indigency hearings, provision of counsel, sentences," or "ordering incarceration." See <u>McCullough I</u>, 907 F.3d at 1331-32; see also <u>McCullough II</u>, 2019 WL 2112963, at *6 (same conclusion as to "the issuance of warrants" and "imprisonment of indigent persons for non-payment of fines"). And as Judge Proctor aptly explained in <u>Ray</u>, the Contract between the City and PPS changes nothing in that regard:

> It is true that the JCS-City Contract made JCS available to the Municipal Court for probation services. But Alabama law permitted the City to make private probation services available to its Municipal Court. ***Nothing in the JCS-City Contract required the Municipal Court to sentence certain defendants to probation. Nor did the JCS-City Contract prevent the Municipal Court from holding indigency hearings or directing JCS to supervise a probationer without charging***

> *fees.*[14] In addition, no evidence indicates that the City or its
> policymakers omitted material information from the Municipal Court or
> misrepresented facts to the municipal court.

See Ray, 2017 WL 660842, at *16 (internal citations omitted) (emphasis

supplied). There can be no question that "under binding precedent, the City simply

cannot be liable under § 1983 for actions taken by the municipal court." See, e.g.,

Woods, 2019 WL 2372236, at *10 (citing Turquitt v. Jefferson County, Ala., 137

F.3d 1285, 1292 (11th Cir. 1998) (en banc)); see also id. at *11 (quoting Turquitt, 137

F.3d at 1292).

Similarly, even if Plaintiffs could somehow establish improper conduct on the

part of PPS and/or its employees, there is no evidence in the record that supports a

finding of *municipal* liability for that conduct. As an initial matter, nothing in the

language of the Contract between the City and PPS required (or even suggested) that

PPS threaten, harass, or intimidate individuals sentenced to probation by Judge Cook.

(See (Exh. A to Alexander Aff.). Further, as Judge Proctor recognized in Ray,

> the City cannot be held liable under Section 1983 solely on the basis of
> a principal-agent relationship between [PPS] and itself, even assuming
> that the [PPS]-City Contract obligated JCS to perform any duties for the
> City. See Evans v. City of Talladega, 136 F. Supp. 3d 1354, 1362 (N.D.
> Ala. 2015) . . . . If the court premised the City's Section 1983 liability
> on that relationship alone, it would be tantamount to imposing
> *respondeat superior* liability.

---

[14]Indeed, the Contract in this case *expressly observed* that the Court could order PPS to
supervise indigent probationers without charging fees. (Exh. A to Alexander Aff., at 8).

See <u>Ray</u>, 2017 WL 660842, at *16. Here, as in <u>Ray</u>, Plaintiffs can point to no "Rule 56 evidence indicating that a final policymaker for the municipality knew of the alleged unconstitutional conduct by [PPS]," let alone that the City directed PPS to continue with any such unconstitutional conduct. See <u>id.</u>[15] Under these facts, there is no authority for the proposition that the City may be held liable for any alleged wrongdoing by PPS.

Plaintiffs can present no evidence of proximate cause linking any City policy directly to any alleged wrongdoing by non-City actors. Therefore, Plaintiffs cannot show that municipal policy was the "moving force" behind their alleged injuries, and the City remains entitled to summary judgment as to the § 1983 claims in this case.

D.   Plaintiffs' Failure to File Notices of Claim with the City Requires Dismissal of Their State-Law Claim

Plaintiffs' sole state-law claim against the City of Decatur is one for false imprisonment, based entirely on arrests allegedly relating to a failure to pay fines and costs assessed against them in Municipal Court cases. (Doc. 41 ¶¶ 163-68). However,

---

[15]For that matter, in the absence of any showing of singularly egregious constitutional violations, even the City's knowledge of some degree of unconstitutional conduct is not sufficient to show that City policy was the moving force behind that conduct. See, e.g., <u>Woods</u>, 2019 WL 237236, at *10-11 (finding that municipal policy could not be deemed the moving force behind any violation, even with city knowledge of alleged problems, where the evidence showed that, among other things, (1) probation was only imposed by the court following an adjudication or plea; (2) defendants were not incarcerated for failure to pay without court order or warrant; (3) defendants were not incarcerated for failing to pay fines; and (4) incarceration was not merely the result of "orders" issued by the probation company).

none of the Plaintiffs filed a notice of claim pertaining to his or her alleged injuries before bringing suit. (See Malone Depo. 58:14-21); (Kimmons Depo. 112:22-25); (Bledsoe Depo. 98:17-99:2); (Fennell Depo. 104:6-105:15); (Mosley Depo. 119:24-120:2); (see also Gilley Aff. ¶ 4). As a result, Alabama's notice-of-claim statute requires summary judgment in the City's favor as to Count IV.

Under Alabama law, "the liability of [a] municipality for tortious claims is only statutory in its origin, and the Legislature may attach such conditions to the right to recover from the municipality for the tort as it deems proper or expedient." See City of B'ham v. Weston, 172 So. 643, 644 (Ala. 1937). Pursuant to this authority, the Alabama Legislature has provided as follows:

> **All claims** against [a] municipality (except bonds and interest coupons and claims for damages) **shall be presented to the clerk** for payment within two years from the accrual of said claim **or shall be barred.** *Claims for damages growing out of torts shall be presented within six months from the accrual thereof or shall be barred.*

Ala. Code § 11-47-23. This notice of claim must include, *inter alia*, "a sworn statement . . . stating substantially the manner in which the injury was received, the day and time and the place where the accident occurred and the damages claimed." Ala. Code § 11-47-192.

These statutes have been construed as imposing **mandatory** requirements that a proper notice of claim be presented to a municipality within the applicable time

period for the claim. See, e.g., Hill v. City of Huntsville, 590 So. 2d 876, 876 (Ala. 1991) (citing Frazier v. City of Mobile, 577 So. 2d 439, 439 (Ala. 1991)). "Alabama courts have refused to accept actual knowledge of a potential claim as a substitute for compliance with the notice-of-claim statutes." See Franklin v. City of Homewood, No. 2:07-cv-006-TMP, 2009 WL 10703684, at *10 (N.D. Ala. May 20, 2009) (quoting Stabler v. City of Mobile, 844 So. 2d 555, 567 (Ala. 2002)), *R&R adopted* (Doc. 199) (N.D. Ala. June 22, 2009). Moreover, state and federal courts in Alabama have consistently applied these mandatory requirements (including the six-month non-claim period from the date of accrual) to state-law claims of false imprisonment against municipalities, such as the claim brought here by Plaintiffs. See, e.g., Jones v. Hutchison, No. 2:08-cv-2082-HGD, 2010 WL 11614624, at *1-2 (N.D. Ala. Aug. 13, 2010), *R&R adopted* (Doc. 36) (N.D. Ala. Sept. 15, 2010); Arceo v. Beedle, 2:06-cv-4810-TMP, 2007 WL 9717216, at *6 (N.D. Ala. Dec. 6, 2007); Harris v. City of Montgomery, 435 So. 2d 1207, 1213-14 (Ala. 1983); Locker v. City of St. Florian, 989 So. 2d 546, 548-50 (Ala. Civ. App. 2008).

Even assuming (incorrectly) that Plaintiffs were ever falsely imprisoned based on an arrest by City police officers or any other action by the City, it is undisputed that these Plaintiffs *never* filed any notice of claim complying with state law, concerning *any* arrest, within the six-month nonclaim period set forth by Alabama

law. Therefore, Plaintiffs' state-law tort claim against the City is due to be dismissed, and the City is entitled to judgment as a matter of law on that claim.

      E.    <u>The City is Immune From Plaintiffs' Baseless State-Law Claim</u>

Plaintiffs allege the City is liable under Alabama law for allegedly arresting and imprisoning them because they were too poor to pay and arresting them based on warrants issued without probable cause. Plaintiffs principally base their false imprisonment claim on the alleged acts of the City's police officers. (Doc. 41 ¶¶ 165-66).[16] However, the City cannot be liable for the actions of its police officers because (1) the officers are entitled to immunity under Alabama law; and (2) any alleged conduct by the officers was purportedly intentional, willful, or wanton.

First, there can be no vicarious liability against an Alabama municipality where the agent whose conduct allegedly creates the liability is immune from suit. See <u>Hollis v. City of Brighton</u>, 885 So. 2d 135, 142 (Ala. 2004). Ala. Code § 6-5-338 provides immunity to law enforcement officers from tort liability for conduct within the scope of their discretionary law enforcement duties. See Ala. Code § 6-5-338(a); <u>Brown v. City of Huntsville</u>, 608 F.3d 724, 741 (11th Cir. 2010). If a police officer is entitled to discretionary function immunity, then so is the municipality he or she

---

[16]The Court has already dismissed this claim to the extent that it is premised on claims of wrongful conduct by the City prosecutor. (See Doc. 75 at 18). Further, because Judge Cook is entitled to judicial immunity, see, e.g., <u>McKinley v. Simmons</u>, 148 So. 2d 648, 650 (Ala. 1963), the City cannot be held liable for his judicial acts. <u>Hollis</u>, 885 So. 2d at 142.

works for. See Ala. Code § 6-5-338(b); <u>Fowler v. Meeks</u>, 569 F. App'x 705, 708 (11th Cir. 2014). Making an arrest is a discretionary function entitling a police officer to immunity from negligence. See <u>Brown</u>, 608 F.3d at 741; <u>Ex parte City of Tuskegee</u>, 932 So. 2d 895, 905-06 (Ala. 2005) (arrest pursuant to capias warrant entitles officer to immunity).

The evidence shows that every relevant arrest addressed in this lawsuit was (1) pursuant to a warrant, and/or (2) on the basis of some criminal act other than a failure to pay fines and costs. Additionally, there is no evidence showing that in carrying out these arrests, any City officer acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law, or that any officer acted in violation of the U.S. or Alabama Constitutions. See <u>James v. City of Birmingham, Ala.</u>, 926 F. Supp. 2d 1260, 1272-73 (N.D. Ala. 2013) (discussing immunity exceptions). This is enough to immunize the City to Plaintiffs' claim.

Second, even if one of the exceptions to immunity applied, the City still could not be held liable. Alabama law provides for *respondeat superior* liability against a municipality resulting from the "neglect, carelessness or unskillfulness of some agent, officer or employee of a municipality engaged in work therefor and while acting in the line of his or her duty." Ala. Code § 11-47-190; see also <u>City of Lanett v. Tomlinson</u>, 659 So. 2d 68, 70 (Ala. 1995). In other words, § 11-47-190 restricts the vicarious liability of Alabama municipalities to negligence-based claims only. See

48

Roberts v. City of Geneva, 114 F. Supp. 2d 1199, 1213 (M.D. Ala. 2000); see also

Cremeens v. City of Montgomery, 779 So. 2d 1190, 1201 (Ala. 2000) (tort claims

against a municipality based on intentional conduct are not maintainable).

Here, because there is no evidence of unconstitutional or fraudulent conduct

by any City officer, that officer would only be deprived of immunity under Ala. Code

§ 6-5-338 if he had acted willfully, maliciously, or in bad faith. However, Ala. Code

§ 11-47-90 immunizes municipalities from claims based on such conduct. See, e.g.,

Hardy v. Town of Hayneville, 50 F. Supp. 2d 1176, 1201-02 (M.D. Ala. 1999).

Therefore, the alternative application of these statutes bars Plaintiffs' false

imprisonment claim, and the City is entitled to summary judgment.

F.     Plaintiff Fennell's Misrepresentations to the Bankruptcy Court
       Require That His Claims Be Dismissed

In his bankruptcy proceeding, which was filed *after* this lawsuit was

commenced, Fennell represented in sworn filings that he is not pursuing any claims

against any third parties. (Exh. 19, at 6). Even after defense counsel in this case

expressly asked Fennell if he had listed this lawsuit in his bankruptcy proceeding

during his deposition, Fennell has taken no steps to amend his disclosures to do so.

(See Exh. 17). Because this failure amounts to a deliberate misrepresentation to the

bankruptcy court, Fennell should be judicially estopped from pursuing his claims in

this lawsuit.

"When a debtor fails to list a pending civil claim as an asset in a bankruptcy proceeding, the equitable doctrine of judicial estoppel allows a court to exercise its discretion to dismiss the debtor's civil claim." Weakley v. Eagle Logistics, 894 F.3d 1244, 1245-46 (11th Cir. 2018) (citing Slater v. U.S. Steel Corp., 871 F.3d 1174, 1180-81 (11th Cir. 2017)). Judicial estoppel is appropriate when (1) the plaintiff "took a position under oath in the bankruptcy proceeding that was inconsistent with the plaintiff's pursuit of the civil lawsuit[]," and (2) his inconsistent positions "were calculated to make a mockery of the judicial system." See id. at 1246.

Here, Fennell's denial in his bankruptcy petition of any pending civil lawsuits, while still pursuing this case, is enough to satisfy the first Weakley factor. See id. Moreover, the totality of the circumstances show that Fennell has intentionally misled the bankruptcy court. Fennell claims he told his bankruptcy attorney about this action, but it is apparent that he took no action to correct the omission of this lawsuit even after reviewing and signing the schedules. And after being asked whether this case had been disclosed in the bankruptcy proceeding, Fennell simply professed ignorance and has plainly taken no further action since. Accordingly, under the doctrine of judicial estoppel, the Court should dismiss Fennell's claims in full.

## IV.   Conclusion

For all of these reasons, the City's motion for summary judgment is due to be granted, and all claims against the City must be dismissed with prejudice.

50

—

                                        s/ George W. Royer, Jr.
                                        George W. Royer, Jr.

                                        s/ David J. Canupp
                                        David J. Canupp

                                        s/ J. Bradley Emmons
                                        J. Bradley Emmons

LANIER FORD SHAVER & PAYNE, P.C.
P. O. Box 2087
2101 West Clinton Avenue,  Suite 102 (35805)
Huntsville, AL 35804
Phone: 256-535-1100 / Fax: 256-533-9322
E-mail: gwr@LanierFord.com; djc@LanierFord.com; jbe@LanierFord.com

Attorneys for Defendant City of Decatur, Alabama

## CERTIFICATE OF SERVICE

I certify that I have filed the foregoing with the Clerk of the Court using the ECF System, which will send notification of such filing to those parties of record who are registered for electronic filing, and further certify that those parties of record who are not registered for electronic filing have been served by mail by depositing a copy of the same in the United States mail, first class postage prepaid and properly addressed to them as follows:

Byron R Perkins
PERKINS LAW
The Civic Center Medical Forum Building
950 22nd Street North, Ste. 550
Birmingham, AL 35203
205-558-4696
Fax: 205-759-3669
bperkins@perkins-law.com

Terrinell Lyons
LYONS LAW FIRM, INC.
612 South Court Street
Florence, AL 35630
256-768-0340
Fax: 256-768-0346
terrinelllyons@aol.com

Lee David Winston
WINSTON COOKS
505 20th Street North Suite 815
Birmingham, AL 35203
205-502-0940
Fax: 205-278-5876
lwinston@winstoncooks.com

Roderick T Cooks
WINSTON COOKS LLC
Two 20th Street North, Suite 1330
Birmingham, AL 35203
205-502-0970
Fax: 205-278-5876
rcooks@winstoncooks.com

Robert L. Wiggins, Jr.
WIGGINS, CHILDS, QUINN & PANTAZIS LLC
The Kress Building
301 19th Street North
Birmingham, AL 35203
rwiggins@wcqp.com

Stephen E Whitehead
Devon Kehres Rankin
LLOYD GRAY WHITEHEAD & MONROE PC
2501 20th Place South, Suite 300
Birmingham, AL 35223
205-967-8822
Fax: 205-402-4085
steve@lgwmlaw.com
drankin@lgwmlaw.com

Bryan A Grayson
LLOYD, GRAY, WHITEHEAD
& MONROE, PC
880 Montclair Road, Ste. 100
Birmingham, AL 35213
205-967-8822
Fax: 205-967-2380
bgrayson@lgwmlaw.com

on this the 9th day of December, 2019.

s/ David J. Canupp
David J. Canupp