FILED
2020 Feb-14  PM 08:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA NORTHEASTERN DIVISION

| | |
|---|---|
| SAMANTHA MALONE, HOLLY KIMMONS, MARK BLEDSOE, ANDY FENNELL, and TRAVIS MOSELY, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )     Civil Action No. 5:16-CV-00483-LCB |
| | ) |
| CITY OF DECATUR, ALABAMA, EMILY BAGGETT, CHRISTY MILLER, and PROFESSIONAL PROBATION SERVICES, | ) ) ) ) |
| | ) |
| Defendants. | ) |

---

## Memorandum in Opposition To Summary Professional Probation Service's Motion For Summary Judgment

---

Plaintiffs Samantha Malone, Holly Kimmons, Mark Bledsoe, Andy Fennell, and Travis Mosley ("Plaintiffs") oppose the Professional Probation Services' ["PPS'] Motion For Summary Judgment.

1

## INTRODUCTION

For over ten years (May 2004-December 31, 2015)[1] the City of DeCatur, Alabama contracted with PPS to operate a probation program to collect fines and increase revenues while allowing PPS to exclusively charge the probationers monthly monitoring fees as part of their collection efforts.  Probation for profit and the associated collection practices is plagued by problems.  See https://nicic.gov/controversy-litigation-and-performance-problems-plague-private-probation-services.

## ADDITIONAL STATEMENT OF
## UNDISPUTED MATERIAL FACTS

**Holly Kimmons**

1.      PPS' supervision and collection of monitoring fees for Holly Kimmons extended over a decade, the life of their contract with the City of DeCatur. Kimmons' first contact being September 30, 2004 and continued in some form until December 21, 2015.  Ex. Kimmons PPS ID 38-67.

2.  Kimmons testified to the harassment she experienced:

Q: All right.  I think you also told me earlier that during some of your meetings with PPS probation officers you felt like there was "harassment" that occurred during those meetings, or was all the harassment over the phones?

---

[1] Doc. 109 City of DeCatur Brief in Support of Summary Judgment Facts 5,14.

A No.  It was in the meetings sometimes. Like if you don't have -- Like if you came in maybe a month or two and didn't have the money, then that's when harassment starts, when you are going to pay extra.  If you don't have it done by such and such day, you know, a warrant can be issued for your arrest. Doc. 110-6, pg. 35 Kimmons, pg. 132:10-22.

3.      The threat of being arrested for failing to pay her monthly monitoring fees

permeated all contact the company.  The appointments were demands to bring

money or be arrested.  Kimmons explained:

Q:  The harassment that occurred during the meetings, was it regarding essentially the same issues as on the phone calls?  Did it all relate to you needing to make payments or you having missed appointments?

A: About appointments missed.  About having paid such and such in so many months. It's adding up, so I have to try to get it down some type of way or if not I would end up arrested. Doc. 110-6, pg. 36, Kimmons Dep. 133:16-25

4.      The reality of being poor meant that Kimmons could not afford her monthly

monitoring fee:

Q What part of that do you disagree with?

A Like the part of you saying -- It says
you have to pay $55 per month for 24 months, but
I didn't have it.  I had to pay my rent.  I had
car insurance, car.  I had to live.  And I guess
they don't want me to live.  I guess they wanted
me to pay them and be on the street, I guess.
Doc. 110-6, pg. 38, Kimmons Dep. 143:15-22

5.  Kimmons testified to the pressure to make payments.

Q I'm not -- I just want to make sure we are on the same page.  So you are saying these communications were harassing?  You believe they are harassing because they were contacting you about payment?

A. A Because I had already gave y'all a payment that I had.  Why would y'all keep calling me, harassing me about paying more when I couldn't pay y'all more? Kimmons pg. 144:20-25

Q. Okay.  So you think they were harassing in nature because you were already trying to pay what you could?

A. Right.  I was giving what I could.  If I didn't have it, I didn't give them nothing. 145:1-3.

6.      The continual threats of payment or jail effected Kimmons' health.

Q: Tell me what you mean when you say you were affected mentally.

A: Well, I got -- I used to have nervous breakdown thinking that if I don't pay these people they money that I'm going to jail.  Like I had kids.  A single parent.  So --. Kimmons 147:20-25


## ANDY FENNELL

7.      Andy Fennell was continually under supervision, paid his monitoring money

fees for the life of PPS's contract with the City of DeCatur from 2005 until

November 17, 2015.  Ex.  PPS ID, pg. 81, 94

8.      Fennell was not advised that community service was an option.

Q:      Do you recall him ever talking about the issue of community service?

Q:      You don't recall that ever coming up?

4

A:      No.  It's only probation.  Pay your fine by Friday or lay it out.  That's your three options. Doc. 110-10, pg. 29 Fennel pg. 108: 16-22

9.      Fennell had to pay money for counseling:

"I had to pay the court referral next
door to the probation office to pee in a cup to
make sure I was clear. Then on top of that I
was giving the probation people money. Then on top of that I was going to class.
Y'all was getting paid from me three ways. Fennell pg. 114

10.      Fennell's decade plus experience within PPS consisted of bring his monthly

fees under threat of imprisonment:

Q On those occasions that you noticed
your balance was incorrect, did you discuss that
with Ms. Bombard?

A Yes. I told her. But like you got to
think about it. It's so many people be in
there, they rushing you out of there. Basically
just getting your money and rushing you out.
They not really -- They not concerned. They are
just worried about you coming in there paying
your money -- they getting paid, you paying your
money. And they waiting on the next person to
come through the door and do the same thing.
They was not concerned, "Hey, how is your family
doing," like a real probation officer supposed
to be. Them people don't care.  Doc. 11-10, pg. 33, Fennell Dep, pg. 123


11.      Posted at the PPS' office entrance was a sign to that advised probationers the

purpose of their visit: If you don't pay your payment, a warrant will be issued for your

arrest. Fennell pg. 129:7-23.

5

12.    Olga Bombard, a PPS parole officer, threatened Fennell with arrests for not

make his payments. Fennell pg. 134.

13.    Fennell described the stark choices presented to him that he was responsible for

paying the monitoring fees that was inconsistent with the Court instructions:


Q How was it inconsistent?

A I mean basically she was saying, hey,
I'm giving you a certain time to have my money.
You need to bring that money back next week or
the week after or whatever. Not no, hey -- And
think about it. I mean you got to have -- You
have to think about it. Paying probation is one
thing. But basically you working, paying bills,
and doing everything else. They have been
plenty of times I had to pick and choose, hey,
should I pay these people or should I pay my
light bill? Do I want to go to jail or do I
want lights? So how do that make you feel? It
is plenty time where I had to pick and choose.
Fennell pg.139:4-17

14.    Complying with the threats to bring money to PPS for their fees, in addition

to court fines jeopardized all aspects of Fennell's marginal economic existence.


Q All right. Are you contending that
PPS threatened you in any other manner than what
you have already told me? You have told me
about threats made by Ms. Bombard about you
potentially going to jail if you don't make
payments. Is there anything else you contend

PPS did to threaten you?

A No. But, I mean, just like I said, I
made sure. The paper ain't got no reason why.
I make my payments so I wouldn't have to go to
jail. But I made a whole lot of sacrifice and
lost a whole lot of stuff that I had just to pay
them money that they wanted.
I mean you might think it's a joke
but, hey, it been plenty of times where either I
had to pick and choose of paying my car payment,
letting them either try to come get it or I got
to pay them. I mean you got to fit that in the
schedule to get them they money. I mean who
want to go to jail, but who want to lose what
they got also. Fennell pg. 141-142

15. As part of this litigation Fennell disclosed that in 2018, he filed for chapter 13

bankruptcy.  Fennell Dec. ¶6

16.  Fennell was unaware that this action was not included in his bankruptcy

submissions. Fennell Dec. ¶6

17.   The Chapter 13 Bankruptcy remains on going and Fennell will contact his

Bankruptcy attorney to filed amended schedules to address the deficient filing.

Fennell Dec. ¶7

18.   Until October 2015, Fennell was unaware that his treatment could form the

basis of legal claim. Fennell Dec. ¶4

MARK BLEDSOE

19.     Mr. Bledsoe has a documented history of substance use disorders and has

suffered brain aneurysm.  Ex. Bledsoe Dec.¶1.

20.     PPS's case notes for Bledsoe reflect, "I believe DEF is mentally impaired"

Ex. 3 Bledsoe PPS Doc 00069 Note For 01-30-2014.

21.   A PPS parole officer advocated that Bledsoe's health issue and medical

doctor's note which affected his ability to pay should not be accepted.  Bledsoe

testified:

"Oh, I repelled back. They drawed me
back up in court to make sure I do the
complying. She stood up and said, Judge, he
doesn't want -- Her exact words said that he was
going to self-medicate his self. Judge said
okay. And then when he said I was going to be
in "Decatur City Inn." But I had a doctor's
excuse. He said he wasn't going to accept it at
first before all this occurred. Doc. 110-9, pg. 32, Bledsoe Dep. Pg. 119-120

22.     PPS parole officer threatened Bledsoe that he would be put in jail if he did

not pay. Bledsoe pg. 122:17-22.

23.     Bledsoe, living with his mother and was barely eeking out a living:

Q. Do you have any estimation of how much you were earning in a typical week in
2014?

A Could have been 100 a week, 125 a week. Could have been less some weeks.

Q And what sort of -- So at that point
in time you were living at your mother's home,
correct?

A Right. Right.  Bledsoe pg. 124:2-9

24.     In addition to PPS Fees, Bledsoe was charged money for taking drug tests.

Q And you were only required to make
payments to PPS on a monthly basis, right?

A Yes. Monthly basis and color code
every time they call your color. That was just
only $20, but you had to go in there and take a
drug test, so...

Q These $20 payments you were making,
were those when you reported to the Quest
office?

A No. That's when they -- When you call
in and you find out whatever your color code is,
if your color code blue that day, then you need
to come in and take your drug test.

Q Where were those drug tests
administered?

A In that office.

Q At what office?

A PPS.  Bledsoe pg. 125, 126.

25. Bledsoe testified to the intimidation with threats of incarceration he

experienced from PPS representatives to collect their monthly monitoring fees and

court fines.

Q How is it that you contend PPS abused
process in your case?

A Well, I mean the time you use your
authority to bully somebody for money, then you
abuse your process. Money that folks don't
have. And I was under medical treatment. I was
under a doctor's care. They could have put that
aside until the doctor got through with me. But
they made sure the judge didn't let me process
that that way. I had to fight with my mind all
the way through traffic, up on medication,
putting other people's lives in danger. They
didn't have no consideration about that. Bledsoe pg. 131:11-33

<u>Travis Mosley</u>

26. As a result of being charged with City of DeCatur Municipal court offenses,

Mosley was under PPS's supervision in 2011. Mosley Dec. ¶1

27. At one point, Mosley received a Facebook message from PPS employee

Kim Williams demanding payment or a warrant would issue for his arrest. Mosley

Dec. ¶2.

28. Mosley testified:

"That Ms. Williams -- that she inboxed me on
5 Facebook from somebody else's account and said if I

      6 didn't come in and pay that she would have a warrant
      7 issued out for me. And the supervisor said -- which I
      8 came in and paid that day -- that was when she told me,
      9 "You just have to come and pay me. You won't have to go
      10 back and see her anymore." But the next month, I was
      11 right back seeing Ms. Williams.  Doc. 110-20, pg. 34
      Mosley Dep. Pg. 128:2-11.

29.    PPS demanded money, including their monitoring fees from Mosley under

threat of arrest. Mosley Dec. ¶ 2.

30.    Mosley understood that he was required to pay a fine and court costs, not a

monthly monitoring fee to PPS.  Mosley Dec. ¶5.

31.  PPS harassment of Mosley extended to his family members and friends

threatening to have Mosley arrested if he did not come in and pay a probation

monitoring fee. Mosley Dec. ¶6.

32.  On some occasions Mosley's father paid the fees to save him from being

arrested in conjunction with PPS collection practices. Mosley Dec. ¶7.

33.  No other collection call as ever threatened Mosley with jail for failing to pay.

PPS misused their authority given to them by the City of Decatur to pay PPS a

monitoring fees under threat of imprisonment.  The monitoring consisted of

demand that Mosley bring money to PPS. Mosley Dec. ¶8.

34.  At the time, Mosley was interacting with City of DeCatur's Municipal Court system and and/or Professional Probation Services, Mosley had no knowledge that their treatment of me could form the basis of a legal claim. Mosley Dec. ¶9.

35.  Only In 2015, I became aware of a community meeting at the DeCatur Boys and Girls Club that discussed that the collection practices of intimidation with the threats of jail for failing to pay monthly monitoring fees could possibly form the basis of a legal claim.   Mosley did not attend the meeting at the Boys and Girls Club but later found out the name of the attorney office and reached out to discuss his experiences.  Mosley Dec. ¶10.

36.  Although Professional Probation Services' contract with City of DeCatur was cancelled and having directly experienced the financial and emotional hardships involved of paying the monitoring fees, Mosley seeks a Court order that the City of DeCatur will not again utilize a private company to threaten intimidate it's poor citizens to pay monthly monitoring fees to the company under threat of jail. Mosley Dec. ¶11.

### **Samantha Malone**

37.    Samantha Malone could not pay her PPS monitoring fees

    Q. Sitting here today, can you tell me
    what process it is that you contend PPS abused
    in some way?

MR. COOKS: Object to the form.

A.  Just the screaming. The screaming --
Well, yelling at me. And then when I would
request for community service, I would be
denied. Doc. 110-2, pg. 27 Malone dep. 98

38.    Kimmons made multiple requests community service to lower her monies

due to PPS.  Except for a single occasion, her requests for community service were

denied. Kimmons testified:

Q Well, are you contending the denial of
community service was somehow constituting abuse
of process?

MR. COOKS: Object to the form.

A Yes, sir. Because I believe if I
am -- if I am behind or anything, that it was
believed -- It was believed that you then, you
know, can do community service. And that was
not granted to me whenever I asked, except for
the one time when I did ask and it was granted.  Doc. 110-2, pg. 31, Kimmons
pg. 99

39.     The PPS' probation officer instructed Malone to pay the money or go to jail.

Kimmons pg. 113:13-17

13

## I.    <u>STANDARD OF REVIEW</u>

"A motion for summary judgment should be granted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (quoting Rule 56(c), Fed.R.Civ.P.). "Summary judgment is improper '[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact.'" *Holifield*, 115 F.3d at 1561 (quoting *Cornelius v. Highland Lake*, 880 F.2d 348, 351 (11th Cir.1989), *cert. denied,* 494 U.S. 1066 (1990)). "The court may not weigh evidence to resolve a factual dispute; if a genuine issue of material fact is present, the court must deny summary judgment." *Holifield*, 115 F.3d at 1561 (citing *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir.1993)). "Likewise, if reasonable minds could differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Holifield*, 115 F.3d at 1561 (citing *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992)). "On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most

favorable to the non-moving party." *Holifield*, 115 F.3d at 1561 (citing *McCabe v. Sharrett,* 12 F.3d 1558, 1560 (11th Cir.1994)

## ARGUMENT

As the Court has learned, this system was a joint contractual venture between PPS and the City of Decatur and then implemented by the Municipal Court.  PPS's systematic and unlawful collection methods were central to its business model. PPS used the specter of incarceration as a cudgel with which extract probation fees out of the Plaintiffs.  This was a patent abuse of process.

I. **The Doctrine of "Equitable Tolling" Revives The Claims of Plaintiffs Malone, Bledsoe, and Mosely**.[2]

We next consider the doctrine of equitable tolling. "[A] litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" as to the filing of his action.  *Weaver v. Firestone,* 155 So.3d 952 (2013) (citing *Pace v. DiGuglielmo,* 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005)).  With regard to the doctrine of "equitable tolling" the Alabama Supreme Court has held that "equitable tolling is available in extraordinary circumstances that are beyond the petitioner's control and that are

---

[2]PPS does not challenge the timeliness of Fennell's and Kimmons's claims.

unavoidable even with the exercise of diligence." *Weaver v. Firestone,* 155 So.3d 952, 958 (2013)   The Court further noted that determining the applicability of equitable tolling depends on: (1) whether principles of equity would make the rigid application of a limitation period unfair; and, (2) whether the petitioner has exercised reasonable diligence in investigating and bringing their claims.  Id. at 957-58.  Finally, the Alabama Supreme Court holds  that whether "equitable tolling is applicable in a case generally involves a " 'fact specific inquiry." Id. at 958.

Here, it is undisputed Plaintiffs Samantha Malone, Mark Bledsoe, and Travis Mosley are all high school drop outs, intermittently employed, and suffer from various societal ills such as mental health issues, periodically incarcerated, been arrested numerous times, suffer from drug and/or alcohol problems, and numerous health maladies.  For example, Ms. Malone dropped out of school in 12th grade due to teen pregnancy, has been arrested over 40 times, and has been on the anti-anxiety medication Xanax for last nine years. [See, Doc.#110-2: Malone Dep. p. 9: ln. 18-p. 10: ln. 14; Dep. p. 37: lns. 5-15; Doc.#110-2: p. 83-100; Doc.#110-1: pgs. 25-28].  Similarly, Mr. Bledsoe dropped out of high school when he was fifteen-years old [15], has been arrested over 60 times, has a history of drug use, and has been in drug treatment programs. [Doc.#110-9: Malone Dep. p. 41: lns. 13-25;

Doc.#110-1: pgs. 35-39; Doc.#110-9: Malone Dep. p. 52: ln. 8-p. 53: ln. 7;

Doc.#110-9: Malone Dep. p. 110: ln. 10-p. 112: ln. 11].

Likewise, Mr. Mosley dropped out of high school in the 9th grade, has been arrested over thirty (30) times, suffers from Epilepsy, and has been incarcerated for periods as long as eight months for minor offenses. [Doc.#110-20: Mosley Dep. p. 77: ln. 20-p. 78: ln. 20; Doc.#110-1: pgs. 48-50; Doc.#110-20: Mosley Dep. p. 25: lns. 11-25; Doc.#110-20: Mosley Dep. p. 161: ln. 4-p. 163: ln. 24]. In addition, the PPS viewed Mosley as mentally ill.[3]

It is patently obvious that these three individuals are undereducated and have lived on society's margins, but yet the Defendant contends that should be expected to know what the statute of limitations is for an abuse of process claim. These individuals that needed to pay PPS a monitoring monthly fees to be able pay traffic and addiction citation violations.

Moreover, there is no evidence that they did not diligently pursue their claims once it was brought to their attention that their rights had been violated. For instance, Mr. Mosley testified that he only learned that he had any rights to protect from a 2014 or '15 Facebook post that purportedly alerted citizens that their rights may have been violated by PPS. [See, Doc. 110-20: Mosley Dep. p. 81: ln.22-p.

87: ln. 11, Mosley Dec.].  Thus, principles of equity make the rigid application of a limitation period here patently unfair.  Furthermore, there is no evidence that Malone, Bledsoe, and Mosley did not exercise reasonable diligence in investigating and bringing their claims.  Bledsoe and Fennell attended a community meeting in October 2015 when they became aware that may possess legal claims.[4]  Therefore, the statute of limitations here must be tolled.

Additionally, the City of DeCatur decision to not renewal PPS's contract does not mean that in the future, post-litigation, that such an arrangement will not re-occur. The plaintiffs experienced the threats of jailing for failing to pay money for monitoring fees and have an interest in not seeing any other citizens in the future experience such treatment.[5]  Past injury and possible re-occurrence give them standing to pursue the equitable claims to preclude such conduct in the future.  See *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1336 (11th Cir. 2013)"While past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy," *Lyons,* 461 U.S. at 103, 103 S.Ct. at 1666, the plaintiff's exposure to illegal conduct in the past is nonetheless "evidence bearing on whether there is a real and immediate threat of

---

[3] See Fact #20 infra.
[4] Fennell Dec.¶4 , Bledsoe Dec.¶7.
[5] See Bledsoe Dec.¶8, Mosley Dec. ¶11, Fennell Dec. ¶6

repeated injury," *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38

L.Ed.2d 674 (1974)."

## II.    PPS Use of Threats of Incarceration For Non-Payment of Probation Fees Was an Abuse of Process.

To prove up a claim of "abuse of process" the Alabama Supreme Court has

held that the petitioner must show, "1) the existence of an ulterior purpose, 2) a

wrongful use of process, and 3) malice." *M & F Bank v. First American Title Ins.*

*Co.,* 144 So.3d 222, 233 (Ala. 2013).  Here, there is ample evidence that PPS used

threats, intimidation, and the specter of probation revocation and incarceration for

the express purpose of extracting fees, to which it was not entitled, from the

Plaintiff. PPS charged all persons it supervised monthly fees of $35—which were

not authorized by state law and at times in excess of the amount specified in the

Contract. [Doc.#110-1: pg. 18].

Moreover, although the State of Alabama authorizes a supervision fee for

persons "subject to supervision by the Board of Pardons and Paroles," Ala. Code §

15-22-2(a)(1), that statute does not apply to **private probation** companies who

contract with municipal courts to supervise defendants who have not received

parole-eligible sentences.  Thus, while section 12-14-13 of the Alabama Code

authorizes probation in municipal court, it does not reference a fee or cost to the

19

probationer and only generally states a municipal court (as opposed to a private provider) may place conditions on the defendant. See Ala. Code § 12-14-13(d). This generalized language, including the statement that the court may impose "any other conditions," does not provide the express authority to charge additional fees. Nor does any other statute provide authority for a fee being an appropriate "condition" of municipal court probation.

Here, each Plaintiff was threatened with probation revocation and incarceration if they did not pay the fees associated with their supervised release. See infra Statement of Facts 1-33.

## **CONCLUSION**

Professional Probation Services' Motion For Summary Judgment is Due to Be Denied.

Respectfully submitted,

/s/ Lee D. Winston
Lee Winston

/s/Roderick T. Cooks
Roderick T. Cooks

/s/Terrinill Lyons
Terrinill Lyons

20

/s/Byron R. Perkins
Byron Perkins

**OF COUNSEL**

Winston Cooks, LLC
505 North 20th Street
Suite 815
Birmingham, AL 35203
205.502.0970

Byron R. Perkins Esq.
Perkins-Law, LLC
Civic Center Medical Forum Building
920-22nd Street N., Suite 825
Birmingham, AL. 35203
205.558.4696

Terrinell Lyons-Edwards
The Law Offices of
Terrinell Lyons
612 S. Court Street
Florence, AL 35630
205.768.0340