FILED
2020 Feb-14  PM 08:21
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SAMANTHA MALONE, HOLLY KIMMONS, MARK BLEDSOE, ANDY FENNELL, and TRAVIS MOSELY, | ) ) ) ) ) | |
|     Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 5:16-CV-00483-LCB |
| CITY OF DECATUR, ALABAMA, EMILY BAGGETT, CHRISTY MILLER, and PROFESSIONAL PROBATION SERVICES, | ) ) ) ) ) | |
|     Defendants. | ) | |

---

## Memorandum in Opposition To Summary City of DeCatur's Motion For Summary Judgment

---

Plaintiffs Samantha Malone, Holly Kimmons, Mark Bledsoe, Andy Fennell, and Travis Mosley ("Plaintiffs") oppose the City of DeCatur's ["DeCatur'] Motion For Summary Judgment.

## INTRODUCTION

The City of Decatur attempts to separate itself from the collection practice that it began with PPS after Mayor Don Kyle signed the contract agreeing to hire them in May of 2004, but it cannot. [Doc.#110-1: Contract Between the City of Decatur and PPS-pgs. 10-16].  The City employed PPS to engage in collection practices where citizens were threatened with jail and allowed PPS to collect monthly monitoring fees directly from the citizens with the same threats of jail for inability pay.  Now in face of abundant proof, the City argues that it hands are clean with regards to any constitutional violations that may have taken place as a result of its relationship with PPS.  Based on the law and the undisputed evidence, it should not be allowed to do so.

## ADDITIONAL STATEMENT OF UNDISPUTED FACTS[1]

### Holly Kimmons

1.     PPS' supervision and collection of monitoring fees for Holly Kimmons extended over a decade, the life of their contract with the City of DeCatur. Kimmons' first contact being September 30, 2004 and continued in some form until December 21, 2015.  Ex. 3 Kimmons PPS ID 38-67.

---

[1] Plaintiffs rely and include the same set of facts in both of their briefs.  The defendants' briefs also set forth detailed interactions between the plaintiffs and PPS and the City of DeCatur Municipal court system.

2.  Kimmons testified to the harassment she experienced:

Q: All right.  I think you also told me earlier that during some of your meetings
with PPS probation officers you felt like there was "harassment" that occurred
during those meetings, or was all the harassment over the phones?

A No.  It was in the meetings sometimes. Like if you don't have -- Like if you
came in maybe a month or two and didn't have the money, then that's when
harassment starts, when you are going to pay extra.  If you don't have it done
by such and such day, you know, a warrant can be issued for your arrest.
Doc. 110-6, pg. 35 Kimmons, pg. 132:10-22.

3.      The threat of being arrested for failing to pay her monthly monitoring fees

permeated all contact the company.  The appointments were demands to bring

money or be arrested.  Kimmons explained:

Q:  The harassment that occurred during the meetings, was it regarding essentially
the same issues as on the phone calls?  Did it all relate to you needing to make
payments or you having missed appointments?

A: About appointments missed.  About having paid such and such in so many
months. It's adding up, so I have to try to get it down some type of way or if not I
would end up arrested. Doc. 110-6, pg. 36, Kimmons Dep. 133:16-25

4.      The reality of being poor meant that Kimmons could not afford her monthly

monitoring fee:

Q What part of that do you disagree with?

A Like the part of you saying -- It says
you have to pay $55 per month for 24 months, but
I didn't have it.  I had to pay my rent.  I had
car insurance, car.  I had to live.  And I guess
they don't want me to live.  I guess they wanted

3

me to pay them and be on the street, I guess.
Doc. 110-6, pg. 38, Kimmons Dep. 143:15-22

5.  Kimmons testified to the pressure to make payments.

Q I'm not -- I just want to make sure we are on the same page.  So you are saying these communications were harassing?  You believe they are harassing because they were contacting you about payment?

A. A Because I had already gave y'all a payment that I had.  Why would y'all keep calling me, harassing me about paying more when I couldn't pay y'all more?
Kimmons pg. 144:20-25

Q. Okay.  So you think they were harassing in nature because you were already trying to pay what you could?

A. Right.  I was giving what I could.  If I didn't have it, I didn't give them nothing.
145:1-3.

6.      The continual threats of payment or jail effected Kimmons' health.

Q: Tell me what you mean when you say you were affected mentally.

A: Well, I got -- I used to have nervous breakdown thinking that if I don't pay these people they money that I'm going to jail.  Like I had kids.  A single parent.  So --.
Kimmons 147:20-25.


## ANDY FENNELL

7.      Andy Fennell was continually under supervision, paid his monitoring money

fees for the life of PPS's contract with the City of DeCatur from 2005 until

November 17, 2015.   Ex.  PPS ID, pg. 81, 94

8.      Fennell was not advised that community service was an option.

Q:     Do you recall him ever talking about the issue of community service?

Q:     You don't recall that ever coming up?

A:     No.  It's only probation.  Pay your fine by Friday or lay it out.  That's your three options. Doc. 110-10, pg. 29 Fennel pg. 108: 16-22

9.     Fennell had to pay money for counseling:

"I had to pay the court referral next
door to the probation office to pee in a cup to
make sure I was clear. Then on top of that I
was giving the probation people money. Then on top of that I was going to class.
Y'all was getting paid from me three ways. Fennell pg. 114

10.     Fennell's decade plus experience within PPS consisted of bring his monthly

fees under threat of imprisonment:

Q On those occasions that you noticed
your balance was incorrect, did you discuss that
with Ms. Bombard?

A Yes. I told her. But like you got to
think about it. It's so many people be in
there, they rushing you out of there. Basically
just getting your money and rushing you out.
They not really -- They not concerned. They are
just worried about you coming in there paying
your money -- they getting paid, you paying your
money. And they waiting on the next person to
come through the door and do the same thing.
They was not concerned, "Hey, how is your family
doing," like a real probation officer supposed
to be. Them people don't care.  Doc. 11-10, pg. 33, Fennell Dep, pg. 123

5

11.     Posted at the PPS' office entrance was a sign to that advised probationers the purpose of their visit: If you don't pay your payment, a warrant will be issued for your arrest. Fennell pg. 129:7-23.

12.     Olga Bombard, a PPS parole officer, threatened Fennell with arrests for not make his payments. Fennell pg. 134.

13.     Fennell described the stark choices presented to him that he was responsible for paying the monitoring fees that was inconsistent with the Court instructions:

Q How was it inconsistent?

A I mean basically she was saying, hey,
I'm giving you a certain time to have my money.
You need to bring that money back next week or
the week after or whatever. Not no, hey -- And
think about it. I mean you got to have -- You
have to think about it. Paying probation is one
thing. But basically you working, paying bills,
and doing everything else. They have been
plenty of times I had to pick and choose, hey,
should I pay these people or should I pay my
light bill? Do I want to go to jail or do I
want lights? So how do that make you feel? It
is plenty time where I had to pick and choose.
Fennell pg.139:4-17

14.     Complying with the threats to bring money to PPS for their fees, in addition to court fines jeopardized all aspects of Fennell's marginal economic existence.

6

Q All right. Are you contending that
PPS threatened you in any other manner than what
you have already told me? You have told me
about threats made by Ms. Bombard about you
potentially going to jail if you don't make
payments. Is there anything else you contend
PPS did to threaten you?

A No. But, I mean, just like I said, I
made sure. The paper ain't got no reason why.
I make my payments so I wouldn't have to go to
jail. But I made a whole lot of sacrifice and
lost a whole lot of stuff that I had just to pay
them money that they wanted.
I mean you might think it's a joke
but, hey, it been plenty of times where either I
had to pick and choose of paying my car payment,
letting them either try to come get it or I got
to pay them. I mean you got to fit that in the
schedule to get them they money. I mean who
want to go to jail, but who want to lose what
they got also. Fennell pg. 141-142

15. As part of this litigation Fennell disclosed that in 2018, he filed for chapter 13

bankruptcy.  Fennell Dec. ¶6

16.  Fennell was unaware that this action was not included in his bankruptcy

submissions. Fennell Dec. ¶6

17.   The Chapter 13 Bankruptcy remains on going and Fennell will contact his

Bankruptcy attorney to filed amended schedules to address the deficient filing.

Fennell Dec. ¶7

18.    Until October 2015, Fennell was unaware that his treatment could form the basis of legal claim. Fennell Dec. ¶4

## MARK BLEDSOE

19.    Mr. Bledsoe has a documented history of substance use disorders and has suffered brain aneurysm.  Ex. Bledsoe Dec.¶1.

20.    PPS's case notes for Bledsoe reflect, "I believe DEF is mentally impaired" Ex. 3 Bledsoe PPS Doc 00069 Note For 01-30-2014.

21.    A PPS parole officer advocated that Bledsoe's health issue and medical doctor's note which affected his ability to pay should not be accepted.  Bledsoe testified:

"Oh, I repelled back. They drawed me
back up in court to make sure I do the
complying. She stood up and said, Judge, he
doesn't want -- Her exact words said that he was
going to self-medicate his self. Judge said
okay. And then when he said I was going to be
in "Decatur City Inn." But I had a doctor's
excuse. He said he wasn't going to accept it at
first before all this occurred. Doc. 110-9, pg. 32, Bledsoe Dep. Pg. 119-120

22.    PPS parole officer threatened Bledsoe that he would be put in jail if he did not pay. Bledsoe pg. 122:17-22.

23.    Bledsoe, living with his mother and was barely eeking out a living:

Q. Do you have any estimation of how much you were earning in a typical week in 2014?

A Could have been 100 a week, 125 a week. Could have been less some weeks.

Q And what sort of -- So at that point
in time you were living at your mother's home,
correct?

A Right. Right.  Bledsoe pg. 124:2-9

24.     In addition to PPS Fees, Bledsoe was charged money for taking drug tests.

Q And you were only required to make
payments to PPS on a monthly basis, right?

A Yes. Monthly basis and color code
every time they call your color. That was just
only $20, but you had to go in there and take a
drug test, so...

Q These $20 payments you were making,
were those when you reported to the Quest
office?

A No. That's when they -- When you call
in and you find out whatever your color code is,
if your color code blue that day, then you need
to come in and take your drug test.

Q Where were those drug tests
administered?

A In that office.

Q At what office?

A PPS.  Bledsoe pg. 125, 126.

25.     Bledsoe testified to the intimidation with threats of incarceration he

experienced from PPS representatives to collect their monthly monitoring fees and

court fines.

Q How is it that you contend PPS abused
process in your case?

A Well, I mean the time you use your
authority to bully somebody for money, then you
abuse your process. Money that folks don't
have. And I was under medical treatment. I was
under a doctor's care. They could have put that
aside until the doctor got through with me. But
they made sure the judge didn't let me process
that that way. I had to fight with my mind all
the way through traffic, up on medication,
putting other people's lives in danger. They
didn't have no consideration about that.  Bledsoe pg. 131:11-33

> Travis Mosley

26.     As a result of being charged with City of DeCatur Municipal court offenses,

Mosley was under PPS's supervision in 2011.  Mosley Dec. ¶1

27.     At one point, Mosley received a Facebook message from PPS employee

Kim Williams demanding payment or a warrant would issue for his arrest. Mosley

Dec. ¶2.

28.  Mosley testified:

10

"That Ms. Williams -- that she inboxed me on
5 Facebook from somebody else's account and said if I
6 didn't come in and pay that she would have a warrant
7 issued out for me. And the supervisor said -- which I
8 came in and paid that day -- that was when she told me,
9 "You just have to come and pay me. You won't have to go
10 back and see her anymore." But the next month, I was
11 right back seeing Ms. Williams.  Doc. 110-20, pg. 34
Mosley Dep. Pg. 128:2-11.

29.    PPS demanded money, including their monitoring fees from Mosley under

threat of arrest. Mosley Dec. ¶ 2.

30.     Mosley understood that he was required to pay a fine and court costs, not a

monthly monitoring fee to PPS.  Mosley Dec. ¶5.

31.   PPS harassment of Mosley extended to his family members and friends

threatening to have Mosley arrested if he did not come in and pay a probation

monitoring fee. Mosley Dec. ¶6.

32.   On some occasions Mosley's father paid the fees to save him from being

arrested in conjunction with PPS collection practices. Mosley Dec. ¶7.

33.   No other collection call as ever threatened Mosley with jail for failing to pay.

PPS misused their authority given to them by the City of Decatur to pay PPS a

monitoring fees under threat of imprisonment.  The monitoring consisted of

demand that Mosley bring money to PPS. Mosley Dec. ¶8.

34.  At the time, Mosley was interacting with City of DeCatur's Municipal Court system and and/or Professional Probation Services, Mosley had no knowledge that their treatment of me could form the basis of a legal claim. Mosley Dec. ¶9.

35.  Only In 2015, I became aware of a community meeting at the DeCatur Boys and Girls Club that discussed that the collection practices of intimidation with the threats of jail for failing to pay monthly monitoring fees could possibly form the basis of a legal claim.   Mosley did not attend the meeting at the Boys and Girls Club but later found out the name of the attorney office and reached out to discuss his experiences.  Mosley Dec. ¶10.

36.  Although Professional Probation Services' contract with City of DeCatur was cancelled and having directly experienced the financial and emotional hardships involved of paying the monitoring fees, Mosley seeks a Court order that the City of DeCatur will not again utilize a private company to threaten intimidate it's poor citizens to pay monthly monitoring fees to the company under threat of jail. Mosley Dec. ¶11.

### Samantha Malone

37.    Samantha Malone could not pay her PPS monitoring fees

> Q. Sitting here today, can you tell me
> what process it is that you contend PPS abused
> in some way?

MR. COOKS: Object to the form.

A.  Just the screaming. The screaming --
Well, yelling at me. And then when I would
request for community service, I would be
denied. Doc. 110-2, pg. 27 Malone dep. 98

38.    Kimmons made multiple requests community service to lower her monies

due to PPS.  Except for a single occasion, her requests for community service were

denied. Kimmons testified:

Q Well, are you contending the denial of
community service was somehow constituting abuse
of process?

MR. COOKS: Object to the form.

A Yes, sir. Because I believe if I
am -- if I am behind or anything, that it was
believed -- It was believed that you then, you
know, can do community service. And that was
not granted to me whenever I asked, except for
the one time when I did ask and it was granted.  Doc. 110-2, pg. 31, Kimmons
pg. 99

39.     The PPS' probation officer instructed Malone to pay the money or go to jail.

Kimmons pg. 113:13-17

## I.   <u>STANDARD OF REVIEW</u>

"A motion for summary judgment should be granted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (quoting Rule 56(c), Fed.R.Civ.P.). "Summary judgment is improper '[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact.'" *Holifield*, 115 F.3d at 1561 (quoting *Cornelius v. Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989), *cert. denied,* 494 U.S. 1066 (1990)). "The court may not weigh evidence to resolve a factual dispute; if a genuine issue of material fact is present, the court must deny summary judgment." *Holifield*, 115 F.3d at 1561 (citing *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir.1993)). "Likewise, if reasonable minds could differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Holifield*, 115 F.3d at 1561 (citing *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992)). "On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most

favorable to the non-moving party." *Holifield*, 115 F.3d at 1561 (citing *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir.1994)

## **ARGUMENT**

The Plaintiffs challenge the following aspects of the City of Decatur's Motion for Summary Judgment:  (1) the Plaintiffs' claims fall outside of the applicable statute of limitations; (2) Plaintiffs cannot show the existence of any "Wrongful Municipal Policy"; and (3) the Plaintiffs' cannot show that "Municipal Custom or Policy" was the moving force behind their injuries.  As will be shown below, these arguments are without merit and the City's Motion for Summary Judgment is due to be denied.

### **A.    The Plaintiff's Claims are Not Time Barred by Any Statute of Limitations**.

The Defendants' statute of limitations argument lacks merit. The statute of limitations for a §1983 claim is two years, but federal law has determined that the action does not accrue until the plaintiff "knows or has reason to know that he has been injured." *Helton v. Clements,* 832 F.2d 332, 334 (5th Cir. 1987). According to the Eleventh Circuit:

> The statute [of limitations] does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably

> prudent regard for his rights.'" (Citations omitted.) Thus
> Section 1983 actions do not accrue until the plaintiff
> knows or has reason to know that he has been injured.
> (Citations omitted). Nor will a Section 1983 action
> accrue until the plaintiff is aware or should have been
> aware who has inflicted his injury. (Citations omitted.)
> *Mullinax v. McElhenney,* 817 F.2d 711, 716 (11th Cir.
> 1987) (emphasis supplied). See *Corn v. Lauderdale*
> *Lakes, 904* F.2d 585, 588 (11th Cir. 1990).

Furthermore, the Eleventh Circuit has adopted the continuing violation doctrine.
"In the context of actions brought pursuant to 42 U.S.C. § 1983, the continuing
violation doctrine permits a plaintiff to sue on an otherwise time-barred claim
when additional violations of the law occur within the statutory period." *Kellat v.*
*Douglas County,* 2011 U.S. App. LEXIS 26442 (11th Cir. Ga. Apr. 7, 2011).
was still on PPS "probation" at the time this lawsuit was filed.

Thus, because the violations of rights were continuing, the statute of
limitations is no bar to  claims.

## II.   A MUNICIPAL POLICY, CUSTOM OR PRACTICE EXISTED FOR PURPOSES OF 42 U.S.C. § 1983 LIABILITY.

It has long been the case that a  municipality may not be held vicariously
liable for the acts of its employees, but can be held liable only where an official
policy or custom directly caused the constitutional violation; i.e., was the "moving
force" behind the injuries.   *Monell v. Dep't of Social Servs.,* 436 U.S. 658,

691(1978).   "An official policy or custom can either be a rule or regulation formally adopted by the governmental entity; a policy statement or decision made by the governmental agency's policy maker; or a practice or course of conduct that is so widespread that it has acquired the force of law even if it has not been formally adopted.  In addition, an official policy or custom may be found if there is proof that there was a practice that was so persistent, widespread or repetitious that the government entity's policy-maker either knew of it or should have known of it. *Jackson v. Miami-Dade County,* 2018 WL 5787247 (S.D. Fla. 11/05/2018)(citing *AFL-CIO V. City of Miami,* 637 F.3d 1178, 1187 (11th Cir. 2011).

A municipality can also be held liable when its employees cause a constitutional injury as a result of the municipality's failure to adequately train or supervise them. However, "the inadequacy of . . . training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388 (1989); accord *Connick v. Thompson,* 563 U.S. 51, 61-62 (2011).   Deliberate indifference is established when the city continues to fail to prevent known constitutional violations.  *Depew v. City of St. Marys, Georgia,* 787 F.2d 1496, 1499 (11th Cir.1986).

Certainly, there is an actionable policy when the appropriate officer or entity

issues an ordinance, regulation, or other generally applicable policy statement and the subsequent, challenged action is an implementation of that official policy. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690 (1978).   Moreover, "[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298 (1986). Here, the Mayor policy's decision in 2004 to bring PPS to the City for collection of city fines was the beginning of the practice challenged in this suit. That practice involved not only that particular decision, but the resulting scheme using the city court, police, treasurer and other city employees for a period of ten years. The contract itself was the catalyst that began the challenged practice.   By virtue of the contract, the City and PPS combined in a joint effort to extort persons unable to pay fines and costs so as to constitute a 'custom or usage' with the force of law.'" *Brown v. City of Fort Lauderdale*, 923 F. 2d 1474, 1481 (11th Cir. 1991)(citations omitted).

When applied here, both the contract with PPS (which the Mayor-approved) and the systematic joint practice of the City through its court, police, clerks, treasurer- and PPS provide ample evidence of the City's policy and practice in this extortion scheme. For these reasons, the City of Decatur's motion for summary judgment is due to be denied. At worst, there are questions of fact for the jury that

18

prevent summary judgment.

### III.   The City of Decatur is Liable For Its Policy And Practice Involving Its Municipal Court.

In its brief, the City of Decatur attempts to separate itself from its court, claiming that it cannot be liable for its courts actions pursuant to § 1983. Unquestionably, the City Mayor (which approved the PPS contract) and who signed the PPS contract is a policymaker for purposes of § 1983. The execution of this contract was an administrative decision of the Mayor of the City – not the municipal court. [See, Doc.#110-1: Contract Between City and PPS pgs. 10-16]. But for the City's administrative decision though its Mayor to use PPS, PPS would not have been present in Decatur and the joint scheme and practice stemming from the PPS contract executed by the City would not have existed.

A decision of the decision-making person is, by definition, a policy of the municipality. "A plaintiff may … confer liability on a local governmental body, by showing either that the 'ultimate decision-making authority acted to deprive the plaintiff of a constitutional right or that the ultimate decision-making authority acquiesced in the deprivation by allowing a custom or practice of such deprivation to exist." *Bland v. Madison County, Fla.,* 895 F. Supp. 1515, 1520 (N.D. Fla. 1995) (citing *Felton v. Board Of Comm'rs Of The County Of Greene,* 5 F.3d 198,

203 (7thCir. 1993)). Stated differently, a city is liable "when the action alleged to be unconstitutional 'implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers,' or the action is 'visited pursuant to governmental "custom" even though such custom has not received formal approval through the body's official decision making channels.'" *Doe v. Miami-Dade County,* 797 F. Supp. 2d 1296, 1307 (S.D. Fla. 2011) (quoting *Monell v. Department of Social Servs.,* 436 U.S. 658, 690-91 (1978)).   In summary, municipalities can be subject to suit under § 1983 for policies and practices involving its municipal court.

Following the remand in *McCollough v. Finley [McCollough I]* 907 F. 3d 1324, (11th Cir. 2018), cited by the City of DeCatur, Judge Lamberth explained that cities, not the municipal courts, can be responsible for the conduct of whoever was hired to collect the fines. In allowing certain claims to proceed, the court explained.

Count VIII alleges constitutional violations through the use of JCS probation and the threat of probation revocation by JCS to collect fines owed to the City. Am. Compl. ¶¶ 235–42. If a municipal court defendant could not pay a fine in full, she was placed on "probation" with JCS. *Id.* ¶ 236. The amended complaint alleges that JCS was no more than the City's collection agency, charging additional fees and threatening probationers with probation revocation and jail time if they could not make their monthly payments. *Id.* ¶ 53. Like most of the other claims, plaintiffs bring this cause of action through Section 1983, and like all the other claims, the

City maintains that *Finley* requires its dismissal on the pleadings. *See* City's Reply 14, ECF No. 182.

*11 The panel described the "probation procedure" of municipal court judges as a judicial—not administrative—act. *Finley*, 907 F.3d at 1331. And so plaintiffs claim again depends on whether the City could be independently responsible for the alleged constitutional violations from JCS's probation program.
In *Carter v. City of Montgomery*—a case before the Court also challenging the City's collection of municipal debts—the Court answered that question in the affirmative. 2019 WL 1440284, at *1–4 (M.D. Ala. Mar. 29, 2019). The Eleventh Circuit has yet to evaluate the pleadings in *Carter*. But nonetheless, in response to a motion for judgment on the pleadings based on *Finley*, the Court held that Alabama law grants municipalities some administrative authority over their municipal courts. *Id.* at *3. For example, municipalities are responsible for "provid[ing] appropriate facilities and necessary supportive personnel for the municipal court and may provide probation services." Ala. Code § 12-14-12. They also have the "power to contract with a private firm to aid in the collection of delinquent municipal court fines." *Wilkins v. Dan Haggerty & Assocs., Inc.*, 672 So. 2d 507, 510 (Ala. 1995). Because the plaintiff in *Carter* alleges that the "City exercised its administrative authority under Alabama law to contract with JCS as part of a scheme to increase revenue at the expense of its residents' constitutional rights," the Court held he had "plausibly alleged that the City's decision to contract with JCS and make it the exclusive operator of probation services within the municipality was the moving force behind the constitutional deprivations alleged." *Carter*, 2019 WL 1440284, at *3–4.

So too here. While the *Carter* complaint relates more directly to the administrative act of contracting with JCS than the plaintiffs' amended complaint, plaintiffs do allege that it was the City, not the municipal court, who contracted with JCS for probation services. Am. Compl. ¶ 52. The contract was signed by Mayor Todd Strange, a final policymaker for the City. *Id.* The plaintiffs allege "the City delegated to JCS" its municipal debt collection function. *Id.* ¶ 61. These are factual rather than conclusory allegations. And they support a plausible inference that the City's delegation of municipal functions through its contract with JCS was the "moving force" behind the constitutional violations alleged in Count VIII. *See Monell*, 436 U.S. at 694.

The City, for its part, argues that the allegations relating to the JCS contract include Mayor Strange and were therefore considered and rejected in the Circuit's evaluation of the complaint. City's Reply 15–16. But the Circuit evaluated the amended complaint only in connection with plaintiffs' anti-peonage/forced labor and false imprisonment claims. These claims have more to do with what happened once the plaintiffs were incarcerated than with the JCS probation program. Thus, to these claims, the City's contract with JCS is far less relevant. But Count VIII deals directly with JCS and its probation practices. It alleges constitutional torts stemming directly from the plaintiffs' placement on probation and their interactions with JCS probation officers. The Court finds the fact that the City hired JCS highly relevant and dispositive to the question of whether plaintiffs plausibly state a Section 1983 claim against the City. The Court denies the City's motion for judgment on the pleadings as to Count VIII.

McCullough v. City of Montgomery, Alabama, No. 2:15-CV-463 (RCL), 2019 WL 2112963, at *10–11 (M.D. Ala. May 14, 2019)

Similarly, here PPS's contract was signed with City of DeCatur by the

Maypr. Ex. 1

The sine qua non of PPS's operating procedure was to threaten probation

revocation and incarceration for failing to pay money included monthly monitoring

fees which due to inability to pay were almost as much as the court fines. The poor

could not escape the financial hardships and left to choose between light bills and

be subjected threats of jail and paying PPS.  The city, not the Municipal Court

system, engaged PPS to collect the money and permitted the charging of monthly

monitoring fees.  The city is a responsible party for any 42 U.S.C. § 1983

violations.

22

**IV.    The City's Relationship With PPS Was The Moving Force Behind The Plaintiffs' Injuries.**

After hiring PPS and happily collecting funds from this joint expedition, Decatur now pretends ignorance and attempts to first isolate itself from its court and then pour all the blame on PPS. Ironically, the Decatur city court simply followed the direction of the mayor by using PPS for collection of fines. The court was only one of many participants in the scheme here.   As stated early the contract was the catalyst that brought PPS to Decatur, beginning the practice under which the City and its court operated. The City court complied with the Mayor's decision and exclusively used PPS for collection of city fines. The intent of the policymaker was made plain through the execution of this contract, and the practice stemming from this contractual relationship is the basis of the City's liability.

**V.    Judicial Estoppel Inapplicable to Fennell's failure to List Claim on Item 33 on Schedule A/B of his Chapter 13 Bankruptcy Filing**

In 2018, Fennell filed for chapter 13 bankruptcy.  The defendants additionally move for summary judgment against Fennell for failing to list this case on his bankruptcy schedules.  There was no attempt to deceive anyone and prior to Fennell's deposition, he disclosed the bankruptcy filing as part of the

23

discovery process.   There was no attempt to hide or make mockery of the bankruptcy system.  The defendant City of DeCatur acknowledges that Fennell informed his bankruptcy counsel about the case.[2]

The Eleventh Circuit has held that a district court can consider that level of sophistication of the plaintiff. See <u>Slater v. United States Steel Corp.</u>, 871 F.3d 1174, 1185 (11th Cir. 2017)(…. the court may consider such factors as the plaintiff's level of sophistication) As discussed infra, Fennell is unsophisticated, lives at margins of the society to the point that he cannot afford to pay traffic and possession of marijuana tickets requiring a monthly supervision fees of $35.00 from PPS.

Fennell's chapter 13 bankruptcy remains on going and he has indicated that he will contact his bankruptcy attorney about amending the forms to list this case. See Fennell Dec.¶7.

<strong><u>CONCLUSION</u></strong>

Summary judgment is due to be denied.

Respectfully submitted,

/s/ Lee D. Winston
Lee Winston

_____

[2] Doc. 109, pg. 30, undisputed Fact 85.

/s/Roderick T. Cooks
Roderick T. Cooks

/s/Terrinill Lyons
Terrinill Lyons

/s/Byron R. Perkins
Byron Perkins

**OF COUNSEL**

Winston Cooks, LLC
505 North 20th Street
Suite 815
Birmingham, AL 35203
205.502.0970

Byron R. Perkins Esq.
Perkins-Law, LLC
Civic Center Medical Forum Building
920-22nd Street N., Suite 825
Birmingham, AL. 35203
205.558.4696

Terrinell Lyons-Edwards
The Law Offices of
Terrinell Lyons
612 S. Court Street
Florence, AL 35630
205.768.0340