FILED

2020 Oct-09  PM 03:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SAMANTHA MALONE,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:16-cv-483-LCB** |
| | ) | |
| **CITY OF DECATUR, ALABAMA,** *et al.*, | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

### I.    Introduction

Before the Court are Plaintiffs' Motion to Dismiss Claims Against City of Decatur, AL (Doc. 147) and Defendant Professional Probation Services, Inc.'s Motion for Summary Judgment (Doc. 111). For the following reasons, both motions are granted.

### II.    Motion to Dismiss Claims Against City of Decatur, AL (Doc. 147)

Plaintiffs have moved the Court under Federal Rule of Civil Procedure 41(a)(2) to dismiss with prejudice all claims against the City of Decatur, Alabama. (Doc. 147). The City of Decatur, Alabama does not object to dismissal with prejudice. (*Id.*).

Except where a plaintiff has filed a notice of dismissal before the opposing party has served either an answer or motion for summary judgment, or where the

parties have filed a stipulation of dismissal signed by all parties who have appeared, "an action may be dismissed at the plaintiff's request only by court order." Fed. R. Civ. P. 41(a)(2).

District courts "enjoy[] broad discretion in determining whether to allow a voluntary dismissal under Rule 41(a)(2)." *Arias v. Cameron*, 776 F.3d 1262, 1268–69 (11th Cir. 2015) (citing *Pontenberg v. Boston Scientific Corp.,* 252 F.3d 1253, 1255 (11th Cir.2001) (per curiam)). The district court should generally grant a motion for voluntary dismissal "unless the defendant will suffer clear legal prejudice other than the mere prospect of a second lawsuit." *Id.* (first citing *Potenberg*, 252 F.3d at 155; then citing *Fisher v. Puerto Rico Marine Mgmt. Inc.*, 940 F.2d 1502, 1502–03 (11th Cir. 1991)). Because the primary purpose of Rule 41(a)(2) is "to prevent voluntary dismissals which unfairly affect the other side," *McCants v. Ford Motor Co., Inc.,* 781 F.2d 855, 856 (11th Cir.1986), the central question is whether the defendant would "lose any substantial right by the dismissal." *Id.* (citing *Pontenberg,* 252 F.3d at 1255).

Because Plaintiffs have moved for dismissal with prejudice and the City of Decatur is unopposed to the motion, the Court finds that defendant would lose no substantial right by the dismissal. Plaintiffs' Motion to Dismiss Claims Against City of Decatur, Al (Doc. 147) is therefore **GRANTED**.

### III.   Defendant Professional Probation Services, Inc.'s Motion for Summary Judgment (Doc. 111)

With the dismissal of the City of Decatur, the only claims that remain pending are those against PPS for abuse of process, and PPS has moved for summary judgment on these claims against all Plaintiffs. (Doc. 115). In moving for summary judgment, PPS contends, first, that Malone's, Bledsoe's, and Mosley's abuse-of-process claims are barred by the statute of limitations, and second, that Plaintiffs cannot present substantial evidence to establish the elements of an abuse of process claim. (Doc. 115 at 32, 37).

Plaintiffs' response fails adequately to respond to either of these arguments. (Doc. 128). With respect to the first, and conceding the untimeliness of their claims, Malone, Bledsoe, and Mosley respond only that "the doctrine of 'equitable tolling' revives them." (*Id.* at 15). And with respect to the second, Plaintiffs cite neither facts nor law to rebut PPS's second argument. (Doc. 128 at 19). Pointing to none, they assert that there is "ample" evidence that "PPS used threats, intimidation, and the specter of probation revocation and incarceration for the express purpose of extracting fees, to which it was not entitled, from the Plaintiff [sic]." (*Id.*).

Because the undisputed facts show that Plaintiffs' claims are either time-barred or unsupported by substantial evidence, the case can be decided as a matter

of law, and Defendant Professional Probation Services, Inc.'s Motion for Summary Judgment (Doc. 111) is granted.

## A. Factual Background[1]

### 1. PPS' Relationship with the City of Decatur.

PPS is a Georgian corporation that provides probation supervision services to municipalities with which it contracts. (Doc. 116–1 at 2). In 2004, PPS entered into a Contract for Probation Supervision and Rehabilitation Services (the "Contract") with the City of Decatur, Alabama ("Decatur"), under which it was to oversee probation programs for offenders in the Decatur Municipal Court (the "Municipal Court"). (*Id.* at 3). The Municipal Court has jurisdiction over misdemeanors, traffic

---

[1] In the Amended Initial Order, the Court set forth strict requirements governing summary-judgment motions and briefs. (Doc. 81 at 14). Under the terms of the order, a party opposing summary judgment is required to submit a statement of facts with a section

> consist[ing] of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts. The non-moving party's response to the moving party's claimed undisputed facts shall be in separately numbered paragraphs that coincide with those of the moving party's claimed undisputed facts. Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based.

(*Id.* at 17). The importance of complying with this procedure is highlighted in the sentence that follows: "All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." (*Id.*).

PPS's motion contains Plaintiffs response contains no such disputes. Instead of addressing any of PPS's 226 paragraphs of facts, Plaintiffs leap straight to a statement of "additional undisputed facts." (Doc. 128 at 2). The Court thus deems all the material facts set forth in PPS's statement of facts admitted for purposes of summary judgment. *See also* Fed. R. Civ. P. 56(c)(3).

offenses, city code violations, and parking tickets that occur within the city limits or police jurisdiction of Decatur. (*Id.*). The Contract was renewed on an annual basis until the end of 2015, when Decatur elected to terminate it. (*Id.*).

### 2. The Scope of PPS's Services.

PPS's responsibilities for probation supervision in Decatur were limited to the services designated in the Contract's Scope of Services and the Specifications for Probation Services ("Specifications"), which were incorporated into the Contract. (Doc. 116–1 at 3). Under the terms of the Contract, PPS was to "provide the services and programs for any offenders placed on probation or referred for the supervision and collection of payment of fines, court costs, restitution or other sums ordered by the [Municipal] Court." (Doc. 116–2 at 2). PPS's probation officers were not involved in the sentencing process and were responsible for supervising offenders on probation only after they had been sentenced to probation by the Municipal Court Judge. (Doc. 116–1 at 3). The Contract did not provide PPS with authority to issue warrants for arrest or otherwise authorize incarceration of probationers. (*Id.*). All decisions regarding revocation of probation and incarceration had to be made by the Municipal Court. (*Id.*). The Contract provides that it does "not apply to cases subject to the authority of the Court Referral Program with regards to alcohol and substance abuse treatment and counseling." (Doc. 116–2 at 2).

### 3.  Probation Supervision Fees.

The Specifications provided that PPS was entitled to collect a $35.00 per month supervision fee from each probationer. (Doc. 116–1 at 4). Even if a probationer elected to or was required to report to PPS's office on multiple occasions during a month, only a single $35 supervision fee would be collected. (*Id.*). PPS was not permitted to, nor did it ever, charge supervision fees on a weekly basis. (*Id.*). The Specifications provided that offenders that the "[Municipal] Court . . . determine[d] as indigent" were to be "supervised at no cost" and that PPS would "not collect a probation supervision fee for any defendant who is determined to be indigent by the [Municipal Court]." (Doc. 116–2 at 9). In instances where an offender was determined to be indigent by the Municipal Court or permitted to perform community service, PPS did not collect supervision fees. (Doc. 116–1 at 4). The Contract did not allow, nor did the Municipal Court ever authorize, PPS to make determinations regarding the indigency of probationers or to alter the terms of a probationer's sentence. (*Id.* at 3).

### 4.  PPS's Training of Probation Officers.

PPS required all new probation officers in its Decatur office to undergo a training program, which included approximately forty hours of instruction. (*Id.* at 5). During the training, probation officers received instruction concerning the ethical standards applicable to probation officers, the constitutional rights of probationers,

and how to handle the collection of fines and fees from probationers. (*Id.*). PPS's training emphasized the importance of respecting probationers and treating them in a dignified manner. (*Id.*). There was no emphasis on maximizing PPS's profits. (*Id.*). Probation officers received further training concerning PPS's Standard Operating Procedures Manual ("SOP Manual"), with which they were expected to comply. (*Id.*). The SOP Manual dictated that "[p]robationers must be treated with professionalism at all times." (Doc. 116–3 at 95).

Each probation officer in the Decatur office was also provided with an Employee Handbook, which emphasized that the success of PPS's business required "fair dealing and ethical conduct" by its employees. (*Id.*). The Employee Handbook also advised employees that they were required to "comply with all applicable laws and regulations" and "to refrain from any illegal, dishonest, or unethical conduct." (Doc. 116–5 at 14). The SOP Manual required that all contacts with probationers be documented in field notes kept by the probation officers, a requirement that PPS emphasized during training. (Doc. 116–1 at 6).

### 5.  Failure to Report Violations.

The SOP Manual set forth procedures for addressing probationers' failure to report for scheduled appointments. (Doc. 116–3 at 95). Upon a missed appointment, the assigned probation officer was required to call at least two known numbers for to reschedule the probationer's appointment. (*Id.*). If the probationer could not be

reached by phone, the probation officer was to mail a missed appointment card with a new appointment date and time. (*Id.*). If the probationer continued to fail to report, the probation officer was to arrange for a hearing to notify the Municipal Court of the probationer's continued failure to report. (*Id.*).

### 6.  Failure to Pay Violations.

When confronted with probationers that failed to pay fines or fees ordered by the Municipal Court, the SOP Manual encouraged probation officers to use encouragement, to remind the probationer of his or her financial obligations, and to help the probationer "make a plan" for payments. (Doc. 116–3 at 126). The SOP Manual did not direct probation officers to threaten incarceration to address a failure to pay. (*Id.*). PPS's probation officers in the Decatur office were never trained, nor is it acceptable under PPS's policies, to threaten, intimidate, or use other untoward means to coerce or persuade a probationer to pay fines or fees. (Doc. 116–1 at 5).

### 7.  Plaintiffs.

#### a.      Samantha Malone.

Over the years, Plaintiff Samantha Malone ("Malone") has been sentenced to probation with PPS on a several times. (Doc. 116–8 at 18). On each occasion she was on probation with PPS, Malone was required by the Municipal Court to report for probation supervision appointments at PPS's office. (*Id.*). PPS probation officers worked with Malone when she was unable to make payments and allowed her to

make them at a later date. (*Id.* at 26). On April 9, 2005, Malone received a ticket in Decatur for a child-restraint violation. (*Id.* at 15). Malone pled guilty to the charge and understood she would be sentenced to probation. (*Id.* at 20). On June 13, 2005, Malone was sentenced by the Municipal Court on the child restraint violation. (*Id.*).

At the time of sentencing, Malone expressed concerns about her ability to pay and requested to do community service. (Doc. 116–8 at 20). However, the Municipal Court Judge declined to permit community service and instead sentenced Malone to make fine payments. (*Id.*). The Sentencing Order was signed by the Municipal Court Judge and Malone. (Doc. 115 at 10). Malone understood that it was the Municipal Court Judge that had sentenced her and that PPS was not involved in her sentencing. (Doc. 116–8 at 20). By signing the Sentencing Order, Malone acknowledged that she had been duly instructed regarding the conditions of her probation. (Doc. 115 at 10). Pursuant to the Municipal Court's Sentencing Order, Malone was sentenced to probation, ordered to pay fines totaling $130, and ordered to pay PPS a supervision fee of $35 per month. (Doc. 116–8 at 15). Malone was ordered to pay all fines and supervision fees directly to PPS. (Doc. 115 at 10).

Malone was ordered to "report to the probation supervisor as directed and cooperate in a truthful and respectful manner." (*Id.* at 11). The Sentencing Order warned that "UPON THE VIOLATION of any of this ORDER, the Defendant may be arrested and subject to incarceration under Rule 26.11, Alabama Rules of

Criminal Procedure. (Doc. 116–8 at 21). Malone understood that she could be arrested if she violated the terms of her probation. (*Id.*). Malone contends that in August 2005 a PPS probation officer threatened her orally, on one occasion, that there would be a warrant for her arrest and she would go to jail if she did not pay the fine by the end of the month. (Doc. 116–8 at 14).

Malone perceived the statement by the PPS officer to be a "threat" because she was speaking loudly and the tone of her voice changed. (*Id.* at 24). The threat communicated by PPS was consistent with the Municipal Court's Sentencing Order, which had warned her that she could be subject to incarceration if she violated the terms of her probation. (*Id.* at 22). Malone understood that PPS did not have the power to arrest her and that any arrest would have to be ordered by the Municipal Court. (*Id.*). On November 10, 2005, PPS submitted a warrant request form for Malone, which described the circumstances of her delinquency as follows: The defendant is in violation of CONDITION #4 of his/her probated sentence, in that, he/she failed to report as directed on July 21, 2005; August 25, 2005; September 13, 2005; September 15, 2005; September 28, 2005; September 29, 2005; September 30, 2005 and November 03, 2005. Further, the defendant is in violation of CONDITION #2 of his/her probated sentence, in that, he/she is $80.00 on [sic] his/her court ordered fine. (*Id.* at 15).

Malone admitted that the information on the warrant request form was accurate and that she had in fact failed to report on the designated dates and had failed to pay $80 of her fine. (*Id.* at 15, 21). On November 19, 2005, the Municipal Court Judge signed a warrant authorizing Malone's arrest. (Doc. 116–8 at 15). On May 22, 2006, a Decatur police officer executed the warrant and arrested Malone. (*Id.* at 14–15). Malone understood that her arrest was not solely because of her failure to pay fines but also because she had missed probation supervision appointments. (*Id.* at 32). Malone was booked into the Decatur City Jail on May 22, 2006. (Doc. 116–8 at 104). Malone paid the $80 balance on her fine on May 22, 2006, the same day she was booked at the jail. (*Id.* at 16, 23).

On May 6, 2008, Malone was issued a ticket by the Decatur Police for driving on a suspended license and a child restraint violation. (Doc. 116–8 at 13). Malone pled guilty to the charges with the understanding that she would have to pay fines for the charges. (*Id.* at 23, 28). At the time of sentencing, Malone did not express any concerns to the Municipal Court Judge about her ability to pay. (*Id.* at 23). Despite being aware of community service as a potential sentencing option, Malone did not request that the Municipal Court Judge sentence her to community service in lieu of paying a fine and did not request any additional information about community service from the court. (*Id.* at 29–30).

On August 28, 2008, Malone was sentenced by the Municipal Court on the driving with a suspended license and child restraint charges. (*Id.* at 13–14, 23). The Sentencing Order was signed by the Municipal Court Judge and Malone. (Doc. 115 at 14). By signing the Sentencing Order, Malone acknowledged that she had been duly instructed regarding the conditions of her probation. (*Id.*). Pursuant to the Municipal Court's Sentencing Order, Malone was sentenced to probation, ordered to pay fines totaling $520, and ordered to pay PPS a supervision fee of $35 per month. (Doc. 116–8 at 23). Malone was ordered to pay all fines and supervision fees directly to PPS. (Doc. 115 at 14). Malone was also ordered to "report to the probation supervisor as directed and cooperate in a truthful and respectful manner." (Doc. 116–8 at 23). The Sentencing Order, which was signed by Malone, also warned that "UPON THE VIOLATION of any of this ORDER, the Defendant may be arrested and subject to incarceration under Rule 26.11, Alabama Rules of Criminal Procedure. (*Id.*). Malone contends a PPS probation officer threatened her, on one occasion, that she would go to jail if she did not pay the fines. (Doc. 116–8 at 14–15). Malone perceived the statement by the PPS officer to be a "threat" because her face turned red and she slightly raised her voice. (*Id.* at 25). However, Malone was able to pay off all the fines she was sentenced to pay and did not go to jail. (*Id.* at 14–15).

In 2009, Malone spent some weekends in jail in conjunction with a theft charge. (Doc. 116–8 at 16). This time in jail was unrelated to her failure to pay any fines. (*Id.*). In 2011, Malone was charged with third-degree theft. (*Id.* at 17). On August 20, 2012, Malone was arrested for violating the terms of her probation associated with the theft charge due to a new harassment charge and her bond was revoked. (*Id.* at 16–17). Malone was booked at the Decatur City Jail on August 20, 2012 and was released on September 4, 2012. (*Id.* at 17–18). The 2012 arrest was unrelated to Malone's failure to pay fines. (*Id.* at 16–17). Contrary to her allegations in the Second Amended Complaint, Malone has never spent a month in jail for failure to pay fines. (*Id.* at 17). Nor has she ever served any weekends for failure to pay fines. (*Id.*). On every occasion that Malone appeared for sentencing in the Municipal Court, the judge would make an opening statement that included a reference to community service. (*Id.* at 29–30). Malone understood that community service was a potential sentencing option because the Municipal Court Judge said that "after so long . . . you could do community service." (*Id.* at 27). Based on the Municipal Court Judge's remarks, Malone's understanding was that the Municipal Court's policy was that you had to be behind on payments for a certain amount of time before community service was an option. (*Id.*). On at least one occasion, Malone's probation officer with PPS raised the possibility of her performing

community service, and she was permitted to perform community service after making such a request. (*Id.* at 26–27).

Malone contends that she was denied the opportunity to perform community service in lieu of paying fines on other occasions. (Doc. 116–8 at 26). However, Malone cannot recall when any of the denials of her community service requests occurred. (*Id.*). Malone does not know the process for approving community service and whether it was PPS or the Municipal Court Judge that had to approve the request. (*Id.* at 26–28). Malone acknowledges that PPS could not alter the terms of her probation and permit her to perform community service when the Municipal Court had ordered her to pay fines and fees. (*Id.* at 28). Malone has not been under any obligation to pay fines to PPS since 2008. (*Id.* at 17). Malone has not reported to PPS for probation supervision since 2012. (*Id.* at 33). Malone contends that her claim against PPS is based on the oral threats from the PPS probation officers. (*Id.* at 27). She also contends that PPS engaged in abuse of process by threatening her with jail and denying her community service. (Doc. 116–8 at 27). The only putative threats by PPS were the oral communications by two probation officers. (*Id.*). Other than these oral communications, no PPS officer ever took any other steps to intimidate or harass Malone. (*Id.*) Malone was never threatened in a physical manner by any PPS probation officer. (*Id.*). Malone does not recall PPS ever extending the time that she was ordered to serve on probation. (Doc. 116–8 at 30). Malone does not contend that

PPS ever forced her to pay more than she was sentenced to pay by the Municipal Court. (*Id.* at 30–31).

### b.   Holly Kimmons.

Plaintiff Holly Kimmons ("Kimmons") was first sentenced to probation in Decatur in 2006. (Doc. 116–9 at 31). Before 2012, Kimmons' probation had always been overseen by the City of Decatur and she had not been required to report to PPS. (*Id.* at 31–32). In 2012, Kimmons started reporting to PPS's office for probation supervision. (*Id.* at 32). On each occasion that Kimmons was sentenced to probation with PPS, she appeared before the Municipal Court Judge and pled guilty. (*Id.* at 36). Before sentencing offenders, the Municipal Court Judge would typically give a speech from the bench in which he would refer to community service as a sentencing option. (*Id.* at 37). Kimmons never expressed any concerns to the Municipal Court Judge about her inability to make the fine payments or requested that she be permitted to perform community service in lieu of paying fines. (*Id.*). At the time of sentencing, the Municipal Court Judge would warn Kimmons that if she violated any of the terms of her probation that she could be incarcerated. (*Id.*).

While on probation with PPS, Kimmons was required to visit PPS's office periodically. (*Id.* at 30). She was required to report once a month and would typically make fine or fee payments based on what she could afford. (*Id.* at 32–33). On some occasions, Kimmons was unable to make scheduled appointments, but PPS

accommodated her requests to reschedule. (*Id.*). As a term of her probation with PPS, Kimmons was required to make payments on her fines and fees to PPS. (*Id.* at 37–38). When Kimmons finished making payments in conjunction with her probation sentence, PPS would end the probation term. (*Id.* at 41). Kimmons was never required to pay PPS fees other than those she was sentenced to pay by the Municipal Court. (*Id.* at 36). Kimmons was sentenced to probation with PPS on two occasions in 2014, and PPS's records do not reflect that Kimmons was ever sentenced to probation with PPS after 2014. (Doc. 116–1 at 7). On January 7, 2014, Kimmons pled guilty and was sentenced to probation with PPS for a charge of theft by deception. (Doc. 116–9 at 17–18).

During her probation period for theft by deception, Kimmons was charged with a new offense of third-degree theft. (Doc. 41 at 17; Doc. 116–9 at 14). As a result of her new charge, a probation violation warrant was issued and Kimmons was arrested on January 24, 2014. (Doc. 116–9 at 22). On June 10, 2014, Kimmons pled guilty to charges of theft in the third degree and resisting arrest. (Doc. 115 at 20). Kimmons was ordered to pay $236 in court costs and $100 in bail bond fees and was sentenced to twenty-four months of probation. (*Id.* at 20–21). Kimmons was also required to attend a PPS theft prevention program. (*Id.* at 21). Though Kimmons has had numerous arrests in Decatur, none of the arrests have been for her failure to pay fines or fees. (Doc. 116–9 at 24–27, 36). Kimmons was charged with new offenses

and arrested for violating the terms of her probation a number of times between 2014 and 2015. (*Id.* at 26). None of these arrests were prompted by PPS, and Kimmons was never arrested based on a warrant issued for her failure to pay PPS. (*Id.* at 26–27, 36).

On February 24, 2015, Kimmons was arrested for theft in the third degree and booked in the Decatur City Jail. (*Id.* at 15; Doc. 115 at 21). Kimmons spent approximately fifty-four days in jail. (Doc. 115 at 21). This is the same jail time referred to in the Second Amended Complaint. (Doc. 116–9 at 15–16). Kimmons contends that PPS engaged in abuse of process by "harassing [her]" when she did not have her whole payment, making references to a warrant being issued if she did not make payment, and "hounding [her] about [payments]". (*Id.* at 33).

The alleged "harassment" occurred mostly over the phone and involved calls from her probation officer about payment issues. (*Id.*). Kimmons cannot recall the exact date of any harassing phone calls. (*Id.* at 35). The phone calls occurred when Kimmons failed to show for an appointment or was late for an appointment. (*Id.* at 34). During the phone calls, the probation officer would ask Kimmons to schedule a new appointment and comment about bringing money with her. (*Id.*). Kimmons contends there was also "harassment" at her in-person meetings when she failed to make a full payment. (*Id.* at 33). Kimmons cannot recall the dates of any of the meetings at which she contends she was harassed. (*Id.* at 35–36). The "harassment"

included statements about missed appointments and a warrant being issued if the balance was not knocked down. (*Id.* at 33, 36).

### c.   Mark Bledsoe.

On January 7, 2014, Bledsoe pled guilty to possession of drug paraphernalia and was sentenced to probation by the Municipal Court. (Doc. 117–14 at 14, 16); Doc. 115 at 23). The Judgment of Guilty, which was executed by the Municipal Court Judge and Bledsoe, indicated that Bledsoe was to pay fines of $726 "or serve community service." (Doc. 115 at 23; Doc. 117–14 at 22–23). The Sentencing Order was signed by the Municipal Court Judge and Bledsoe. (Doc. 115 at 23). By signing the Sentencing Order, Bledsoe acknowledged that he had been duly instructed regarding the conditions of his probation. (*Id.*). In accordance with the Municipal Court's Sentencing Order, Bledsoe was sentenced to probation, ordered to pay fines totaling $726, and ordered to pay PPS a supervision fee of $35 per month. (Doc. 115 at 23; Doc. 117–14 at 16–17). Bledsoe was ordered to pay all fines and supervision fees directly to PPS. (Doc. 115 at 23).

Bledsoe was ordered to "report to the probation supervisor as directed and cooperate in a truthful and respectful manner." (*Id.* at 24). Bledsoe was also ordered to "contact, register and complete" the Court Referral Program ("CRP"). (*Id.*). The Sentencing Order warned that "UPON THE VIOLATION of any of this ORDER, the Defendant may be arrested and subject to incarceration under Rule 26.11,

Alabama Rules of Criminal Procedure." (*Id.*). Bledsoe ultimately elected to complete community service in lieu of paying fines and fees and resolved his sentence. (Doc. 117–14 at 23). He informed PPS that he wanted to do community service, and PPS accommodated the request. (*Id.* at 28–29).

On January 16, 2014, PPS completed the necessary paperwork to allow Bledsoe to perform community service. (Doc. 115 at 24; Doc. 117–14 at 37). Bledsoe completed all of his community service by March 21, 2014 and owed no fine balance on his charges. (Doc. 117–14 at 39–40; Doc. 115 at 24). PPS's records reflect that its supervision of Bledsoe concluded on March 21, 2014 and that it never again had contact with Bledsoe. (Doc. 116–1 at 7; Doc. 115 at 24–25). When Bledsoe finished the community service, he was still required to complete the next part of his probation, which involved "color codes." (Doc. 117–14 at 23). The color codes were part of a drug treatment program that was administered by a company called Quest, and PPS was not involved in the administration of the program. (*Id.* at 29; Doc. 116–1 at 5–6). Bledsoe initially suggested that PPS was involved with the color codes but later admitted that he did not know whether the personnel administering the program were affiliated with Decatur, Quest, or PPS. (Doc. 117–14 at 29). The "color codes" to which Bledsoe referred were part of the CRP, which had also been ordered as part of Bledsoe's probation. (Doc. 116–1 at 6). PPS played no role in administering the CRP and, once he completed community service, was

not involved with Bledsoe's probation. (*Id.*). When Bledsoe's color was called, he was required to pay a $20 fee. (Doc. 117–14 at 23). Bledsoe does not know what the $20 payments were for or whom the money went to. (*Id.* at 33).

On September 29, 2014, Bledsoe was admitted to Huntsville Hospital as the result of an intracranial hemorrhage. (Doc. 115 at 25–26). Bledsoe remained hospitalized as a result of the medical episode until he was discharged on October 10, 2014. (*Id.* at 26). On November 10, 2014, the Municipal Court Judge signed a warrant for Bledsoe's arrest as his new charge of public intoxication was a violation of his probation. (*Id.*; Doc. 117–14 at 19–21). The warrant did not refer to Bledsoe's failure to pay fines, fees, court costs, or restitution. (Doc. 117–14 at 21).

On November 10, 2014, Bledsoe was arrested for public intoxication and also charged with a probation violation. (*Id.* at 17–18; Doc. 115 at 26). On November 14, 2014, Bledsoe pled guilty to public intoxication. (Doc. 117–14 at 19). At the time of sentencing, Bledsoe had been in jail for five days and was sentenced to time served. (*Id.* at 19, 27–28). Bledsoe contends that his claims against PPS are based on the period of probation following his sentencing for possession of drug paraphernalia. (*Id.* at 28). Bledsoe further contends that PPS engaged in abuse of process by "bully[ing] [him] for money. (*Id.* at 34). He contends the bullying started after he had completed community service and was doing color codes. (*Id.* at Bledsoe Depo. at 37). He contends that PPS was bullying him because it was asking for money after

he had just gotten out of the Intensive Care Unit at Huntsville Hospital. (*Id.* at 34). Bledsoe recalls a PPS probation officer remarking that he would go to jail if he failed to make all his fine payments but cannot recall when this occurred. (*Id.* at 32). The alleged message from the PPS probation officer was consistent with what the Municipal Court Judge had previously told him. (*Id.*).

### d.   Andy Fennell.

On September 23, 2014, Fennell was arrested by the Decatur Police. (Doc. 118–1 at 19). Fennell was charged with driving with a revoked license, prohibited stopping/standing, and possession of marijuana in the second degree. In Plaintiffs' Second Amended Complaint, Fennell listed the charges as driving with a revoked license and speeding. (Doc. 41). Fennell pled guilty to driving while revoked in November 2014 and was ordered to pay $262 in costs and fines. (Doc. 118–1 at 20, 23). Fennell also pled guilty to possession of marijuana in November 2014 and was ordered to pay $726 in total fines and court costs for that charge. (*Id.* at 20, 23). The charge for prohibited stopping and standing was dismissed. (*Id.* at 20).

On November 12, 2014, Fennell was sentenced by the Municipal Court on the possession of marijuana and driving while revoked charges. (*Id.* at 29). The Sentencing Order was signed by the Municipal Court Judge and Fennell. (*Id.*). By signing the Sentencing Order, Fennell acknowledged that he had been duly instructed regarding the conditions of his probation. (Doc. 115 at 28). Pursuant to

the Municipal Court's Sentencing Order, Fennell was sentenced to probation, ordered to pay fines totaling $988, and ordered to pay PPS a supervision fee of $35 per month. (*Id.* at 28–29). Fennell was ordered to pay $85 each month toward his fine and a monthly probation fee of $35 to PPS for a total monthly amount of $120. (Doc. 118–1 at 23).

At the time of sentencing, Fennell expressed concern to the Municipal Court Judge about his ability to pay the ordered fines, but the Judge told him to "pay or go to jail." (Doc. 118–1 at 37). Fennell was ordered to pay all fines and supervision fees directly to PPS. (Doc. 115 at 29). Fennell was ordered to "report to the probation supervisor as directed and cooperate in a truthful and respectful manner." (*Id.*). Fennell was also ordered to "contact, register and complete" the CRP. (*Id.*). At the time of sentencing, the Municipal Court Judge informed Fennell that if he violated a term of his probation, he could be incarcerated. (Doc. 118–1 at 29). The Sentencing Order also warned that "UPON THE VIOLATION of any of this ORDER, the Defendant may be arrested and subject to incarceration under Rule 26.11, Alabama Rules of Criminal Procedure. (Doc. 118–1 at 37). Fennell would report to PPS on a monthly basis to make payments and meet with his probation officer. (*Id.* at 27, 32). Fennell made all payments he was sentenced to pay for the possession of marijuana and driving while revoked charges and was never arrested for failing to pay. (*Id.* at 27, 38, 39).

Fennell has not been arrested in Decatur since his arrested in September 2014. (*Id.* at 21, 29). Fennell threw away his shoebox of receipts for payments to PPS and does not know the total amount that he paid to PPS or the amount that he had paid in any given month. (*Id.* at 31–32). As part of the CRP to which he was sentenced, Fennell was required to attend a drug counseling program run by Riverside Counseling and for the program was required to pay over $400. (*Id.* at 30–31). The counseling sessions took place at Riverside's office, and Fennell was required to make cash payments there. (Doc. 118–1 at 30). Fennell does not know to whom the money he paid at Riverside went. (*Id.* at 30–31). The CRP also required Fennell to report for drug tests when his color code was called. (*Id.* at 31, 39). Fennell was also required to make payments when he reported for drug screens. (*Id.*). He does not know who collected the money from the drug screens. (*Id.*). The drug counseling program and drug tests that he was required to complete were not administered by PPS, and PPS did not collect any of the fees associated with the programs. (Doc. 116–1 at 6). Fennell's claims against PPS all relate to actions that occurred after November 12, 2014 when he was sentenced on the charges of marijuana possession and driving with a revoked license. (Doc. 118–1 at 29–30). Fennell contends his PPS probation officer threatened him by stating that he could be arrested if he failed to make payments by a certain time. (*Id.* at 36–37). PPS did not take any other actions

to threaten Fennell. (*Id.* at 38). Fennell's abuse of process claim is not based on any acts other than the threats made by PPS. (*Id.*).

### e.  Travis Mosley.

In 2006, Mosley was charged with theft by leasing and was ordered to serve two years on probation with PPS and pay a fine of $370. (Doc. 119–1 at 35). In 2007, he received a ticket for driving on a suspended license and speeding and was ordered to continue on probation with PPS, and to continue making payments of $85 each month. (*Id.* at 25). In 2008, Mosley received a ticket for driving on a suspended license. (*Id.*). In 2009, he was charged with driving while revoked and was ordered to remain on probation until this and his earlier fines were paid. (*Id.* at 26). In 2010, he received a ticket for driving while revoked and was fined $683. (*Id.*). He was ordered to remain on probation with PPS until all fees were paid. (*Id.* at 35). At the sentencing on all of Mosley's charges, the Municipal Court Judge informed him that he could be incarcerated if he violated a term of his probation. (Doc. 119–1 at 35). Mosley understood this to mean that if he did not make payments that were due under the probation order, he could be incarcerated for the violation. (*Id.*).

At times, Mosley reported to PPS for his probation meetings without payments and PPS allowed him to come back the following week. (*Id.* at 41–42). If Mosley reported to his probation meeting with less than his set monthly payment, PPS would accept the partial payment and schedule an appointment for Mosley to

return the next week with the remaining amount. (*Id.* at 42). Mosley ultimately paid off all court ordered fines and his fees to PPS for all charges and has no outstanding balance. (*Id.* at 35). Mosley has not reported for probation at PPS's office, made payments to PPS, or communicated with PPS probation officers at any time after April of 2011. (*Id.* at 37). Between 2010 and 2011, Mosley failed to report to four consecutively scheduled probation-supervision appointments, missing appointments in November of 2010, December of 2010, January of 2011, and February of 2011. (*Id.* at 36). After failing to report to his scheduled visits four months in a row, PPS requested the issuance of a warrant. (*Id.*).

On April 7, 2011, Mosley was arrested for failing to pay child support and incarcerated at the Morgan County Jail from that date until July 27, 2011. (Doc. 119–1 at 28–29, 36). After his release from Morgan County Jail, Mosley was arrested by Decatur City Police on the outstanding warrants and transferred to Decatur City Jail. (*Id.* at 30, 37). On April 29, 2011, a warrant was issued for Mosley's arrest by the City of Decatur. (*Id.* at 28–29). However, the warrant was not executed until July of 2011 when Mosley was released from Morgan County Jail. (*Id.* at 30). The dates that he had failed to report to his probation supervision meetings did not overlap with the dates that he had been incarcerated in the Morgan County Jail. (*Id.* at 37). Mosley had no other encounters with Decatur City Police following his release from Decatur City Jail. (*Id.* at 30). Mosley contends that his abuse of process claim against PPS is

based on the "harassment" he was subjected to and the unfair treatment he received. (*Id.* at 37, 38). Mosley contends that he was subjected to harassment by PPS because PPS would call his friends and family members and make threats about locking him up. (*Id.* at 37, 40–41). PPS never made any threats to Mosley other than the threat that he could be incarcerated if he failed to pay. (*Id.* at 38).

On one occasion in 2011, Mosley contends that he received a threatening Facebook message from the account of a woman he went to high school with named Sherika White. (Doc. 119–1 at 33–34). The message claimed to be written by Mosley's probation officer at the time, Kimberly Williams. (*Id.* at 34). The message stated: "Hi, this is Ms. Williams. If you don't come in and pay, that [sic] I will have to issue a warrant out for your arrest." (*Id.*). The alleged threats of incarceration by PPS were consistent with what the Municipal Court Judge had relayed to Mosley at the time he was sentenced to probation. (*Id.* at 38). Mosley admits that all the fines and fees he was harassed about paying were fines and fees that had been ordered by the Municipal Court. (*Id.* at 37–38). Mosley thought it was unfair that when he paid $50 that $35 would go towards a probation fee. (*Id.* at 37).

## B. Legal Standards

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A fact

is "material" if its resolution "may affect the outcome of the suit under the governing law." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997)). A dispute is "genuine" if under the evidence "a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996)).

In deciding whether there is a genuine dispute as to a material fact, a court must presume the nonmovant's evidence to be true and draw all reasonable inferences in the nonmovant's favor. *Id.* (citing *Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1164 (11th Cir.2003)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)).

## IV. Analysis

### A. Malone's, Bledsoe's, and Mosley's abuse-of-process claims are barred by the statute of limitations

Abuse-of-process claims under Alabama law are governed by a two-year statute of limitations. *See* Ala. Code § 6-2-38(l) ("All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated

in this section must be brought within two years"); *see also Plant v. R. L.*, 313 So. 2d 518, 522 (Ala. 1975). A "plaintiff's ignorance of a tort" does not toll the statute of limitations: time begins to run "as soon as the party in whose favor it arises is entitled to maintain an action" on the claim. *Payne v. Alabama Cemetery Ass'n, Inc.*, 413 So. 2d 1067, 1072 (Ala. 1982).

"The doctrine of equitable tolling preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable." *Lambert v. United States*, 44 F.3d 296, 298 (5th Cir. 1995). Under Alabama law, a plaintiff "seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Weaver v. Firestone*, 155 So. 3d 952, 957 (Ala. 2013) (quoting *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005)). Equitable tolling is available only "in extraordinary circumstances that are beyond the petitioner's control and . . . are unavoidable even with the exercise of diligence." *Ex parte Ward*, 46 So. 3d 888, 897 (Ala. 2007). "The threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the rule." *Weaver v. Firestone*, 155 So. 3d 952, 958 (Ala. 2013) (citation omitted).

The alleged threats that underlie Malone's abuse-of-process claims occurred in 2005 and, at the latest, in late 2008; those underlying Bledsoe's no later than March 21, 2014; and those underlying Mosley's on or before April 2011. Malone

and Bledsoe first raised their abuse-of-process claims on March 24, 2016 (Doc. 1), and Mosley first raised his on June 28, 2016. (Doc. 22).

Plaintiffs concede that the alleged injuries giving rise to their claims all occurred more than two years before they were filed—before March 24, 2014 for Malone and Bledsoe, and before June 28, 2014 for Mosley. To save their claims, Plaintiffs argue only that they are "revived" by the doctrine of equitable tolling. (Doc. 128 at 15).

The Court is unpersuaded that strict application of the statute of limitations would be inequitable. Citing no authority, Plaintiffs suggest that their undereducation, poor health, and drug use should excuse them from timely filing their claims. Ignorance of the law does not toll the limitations period, *Payne*, 413 So. 2d at 1072, and Plaintiffs have not otherwise shown how theirs circumstances are, for filing purposes, "extraordinary," *Weaver*, 155 So. At 957. Nor have Plaintiffs met their burden of establishing that they have diligently pursued their claims, *id.*; rather, falling far short of their evidentiary burden, Plaintiffs posit that to satisfy their burden it's enough that there is "*no* evidence that they *did not* diligently pursue their claims once [they were] brought to their attention." (Doc. 128 at 17) (emphasis added).

The Alabama Supreme Court has made clear that equitable tolling should apply only "in extraordinary circumstances that are beyond the petitioner's control"

that are "unavoidable even with the exercise of diligence." *Ward*, 46 So. 3d at 897. Because Malone, Bledsoe, and Mosley have proven no such circumstances, the Court will not equitably toll the statute of limitations.

> **B.    Kimmons and Fennell have not presented substantial evidence establishing the elements of an abuse-of-process claim against PPS**

Abuse of process is "the malicious perversion of a regularly issued process to accomplish a purpose whereby a result not lawfully or properly obtainable under it is secured." *Duncan v. Kent*, 370 So. 2d 288, 290 (Ala. 1979). Under Alabama law, "the tort of abuse of process has three elements . . . [and] [e]ach element must be proven individually." *C.C. & J., Inc. v. Hagwood*, 711 So. 2d 947, 951 (Ala. 1998) (internal citation omitted). To establish a claim for abuse of process, a plaintiff must prove: (1) that a lawful process was issued for an ulterior purpose; (2) that the process was thereafter wrongfully used; and (3) that the process was employed with malice. *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015, 1024–26 (Ala. Civ. App. 1999). A plaintiff must show more than that a defendant has carried out "the process to its authorized conclusion, even with bad intentions." *Willis v. Parker*, 814 So. 2d 857, 865 (Ala. 2001).

PPS contends that Plaintiffs cannot present substantial evidence that PPS (1) caused any process directed at them to be issued; (2) possessed an ulterior purpose; (3) wrongfully used a legal process; or (4) employed the process with malice. Plaintiffs' response

Plaintiffs respond with neither facts nor legal authority to rebut PPS's argument. The Court noted this deficiency at the hearing on the parties' motions, warning Plaintiffs that by failing to address the defendants' arguments, they risked abandoning their claims. *See Floyd v. Home Depot U.S.A., Inc*., 274 F. App'x 763, 764 (11th Cir. 2008) (holding that the district court properly found that the plaintiff had abandoned his ADA retaliation claim by failing to respond to the defendant's argument concerning a lack of causal connection). Plaintiffs were thus given a second chance and permitted to argue the issues orally, speaking directly to the arguments that they had failed to address in their briefs. There, too, they failed to address the Court's concerns and to rebut the defendants' arguments.

Nevertheless, the Court may not enter summary judgment by default "but, rather, must consider the merits of the motion." *Jacoby v. Baldwin Cty.*, 596 F. App'x 757, 762 (11th Cir. 2014) (quoting *Trs. Of Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emp'rs v. Wolf Crane Serv., Inc.,* 374 F.3d 1035, 1039 (11th Cir.2004)). Having considered the motion, the briefing, argument by counsel, and the evidentiary records, the Court concludes that Kimmons and Fennell have failed to present substantial evidence to create a genuine dispute of material fact as to an essential element of their abuse-of-process claims.

Neither Kimmons nor Fennell has presented any evidence to show that lawful process was issued for an ulterior purpose. All harassment alleged by either

Kimmons or Fennell was in furtherance of the Municipal Court's Sentencing Orders, and there is no evidence that any alleged threats were ever made for any reason other than ensuring Plaintiffs' compliance with the terms of their sentencing orders. It would not be enough to show that PPS had carried out "the process to it authorized conclusion, even with bad intentions," *Willis,* 857 So. 2d at 865; and even assuming that PPS's alleged threats suggested "bad intentions," that would be all that Plaintiffs could show. There is no evidence that PPS made any threatening statements with an ulterior purpose.

Kimmons and Fennell have thus failed to prove an essential element of their abuse-of-process claims. Accordingly, because Malone, Bledsoe, and Mosley brought their claims after the expiration of the statute of limitations, and because Kimmons and Fennell have failed to prove an essential element of their abuse-of-process claims, Plaintiffs' claims must be dismissed.

## V.   Conclusion

Motion to Dismiss Claims Against City of Decatur, AL (Doc. 147) is **GRANTED**, Defendant Professional Probation Services, Inc.'s Motion for Summary Judgment (Doc. 111) is **GRANTED**, and all other pending motions (Docs. 106, 108 & 112) are **DENIED AS MOOT**.

**DONE** and **ORDERED** this October 9, 2020.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE